1   MARK MERMELSTEIN (STATE BAR NO. 208005)
    mmermelstein@orrick.com
2   MONA S. AMER (STATE BAR NO. 187090)
    mamer@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    777 South Figueroa Street, Suite 3200
4   Los Angeles, CA  90017-5855
    Telephone:   +1 213 629 2020
5   Facsimile:   +1 213 612 2499

6   HAMILTON E. ARENDSEN (STATE BAR NO. 212844)
7   harendsen@arendsenlaw.com
    ARENDSEN CANE MOLNAR LLP
8   550 West C Street, Suite 1150
    San Diego, CA 92101
9
    Attorneys for Defendant
10  JEFFREY DAVID GROSS

11

12                  UNITED STATES DISTRICT COURT

13                 CENTRAL DISTRICT OF CALIFORNIA

14                      SOUTHERN DIVISION

15

16

17  UNITED STATES OF AMERICA,           Case No. 18-cr-00014-JLS-1

18              Plaintiff,              **DEFENDANT JEFFREY D.
                                        GROSS' NOTICE OF MOTION
19       v.                             AND MOTION TO DISMISS
                                        COUNTS 2-8 AND 10-14 OF
20  JEFFREY DAVID GROSS,                INDICTMENT; MEMORANDUM
                                        OF POINTS AND AUTHORITIES;
21              Defendant.              DECLARATION OF MARK
                                        MERMELSTEIN IN SUPPORT
22                                      THEREOF**

23                                      Date:  October 26, 2018
                                        Time: 9:00 a.m.
24                                      Courtroom 10A

25                                      Hearing Time Estimate: 30 minutes

26                                      Judge:   Josephine L. Staton
                                        Date Action Filed:  01/23/2018
27

28

1  **TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

2       PLEASE TAKE NOTICE that on October 26, 2018, at 9:00 a.m., or as soon

3  thereafter as the matter may be heard before the United States District Court for the

4  Central District of California, Defendant Dr. Jeffrey D. Gross ("Dr. Gross"),

5  through his attorneys of record herein, will and hereby does move this Court,

6  pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, for an order

7  dismissing with prejudice Counts 2-8 and 10-14 of the indictment filed under seal

8  against Dr. Gross on January 23, 2018, and unsealed on May 18, 2018 in this

9  action. ECF Dkt. 1.

10       This Motion is made on the grounds that Counts 2-8 and 10-14 of the

11  Indictment are barred by the applicable statute of limitations, 18 U.S.C. section

12  3282. This motion is based upon this Notice, the attached Memorandum of Points

13  and Authorities, the Declaration of Mark Mermelstein, the complete files and

14  records in this action, such oral and documentary evidence as may be presented at

15  any hearing on this motion, and other authorities to be submitted in any

16  supplemental briefing or at the time this motion is heard.

17       Pursuant to the Order Re Criminal Proceedings applicable to this case (ECF

18  Dkt. 25), counsel for Mr. Gross has met and conferred extensively with the U.S.

19  Attorney's Office regarding the substance of this Motion. The parties are in

20  agreement regarding the issues to be presented to the Court, and have determined

21  that the scope of issues to be presented to the Court cannot be narrowed.

22

23  Dated: September 28, 2018          MARK MERMELSTEIN
                                  MONA S. AMER

24                                    Orrick, Herrington & Sutcliffe LLP

25

26                              By:_____

27                                  MARK MERMELSTEIN
                                    Attorneys for Defendant
                                  JEFFREY DAVID GROSS

28

**TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I.      INTRODUCTION .................................................................................. 1

II.     STATEMENT OF FACTS AND PROCEDURAL BACKGROUND ......... 3

III.    ARGUMENT ......................................................................................... 8

        A.      The Indictment Was Improperly Sealed ................................. 8

        B.      Similar Conduct Has Occurred in Other Pacific Hospital Cases ........ 11

        C.      Courts Routinely Dismiss Improperly Sealed Indictments ............... 16

IV.     CONCLUSION .................................................................................... 21

DECLARATION OF MARK MERMELSTEIN ...................................................... 25

18-CR-00014-JLS-1

1
## <u>TABLE OF AUTHORITIES</u>
2
**Page(s)**
3
**Cases**

4
*State Compensation Insurance Fund v. Drobot, Sr., et al.*,
5
   SA CV 13-956-AG ................................................................................................... 4
6
*Toussie v. United States*,
7
   397 U.S. 112 (1970) .............................................................................................. 21
8
*United States v. Benavides*,
9
   2009 WL 10679152 (D. Mt. Dec. 15, 2009) ................................................. *passim*
10
*United States v. Bracy*,
11
   67 F.3d 1421 (9th Cir. 1995) ................................................................................ 8, 9
12
*United States v. Cosolito*,
   488 F. Supp. 531 (D. Mass. 1980) ......................................................................... 16
13
*United States v. Deglomini*,
14
   111 F. Supp. 2d 198 (E.D.N.Y. 2000) ............................................................... 9, 22
15
*United States v. DiSalvo*,
16
   34 F.3d 1204 (3d Cir. 1994) .................................................................................... 9
17
*United States v. Gigante*,
18
   436 F. Supp. 2d 647 (S.D.N.Y. 2006) .............................................................. 20, 21
19
*United States v. Gross*,
20
   18-CR-0014, ECF Dkt. 14 ..................................................................................... 12
21
*United States v. Marion*,
22
   404 U.S. 307 (1971) .............................................................................................. 22
23
*United States v. Pacheco*,
   912 F.2d 297 (9th Cir. 1990) ................................................................................... 8
24
*United States v. Payne*,
25
   SA CR 17-0053-JLS-1 (June 6, 2017) .................................................................. 11
26
*United States v. Ramey*,
27
   791 F.2d 317 (4th Cir. 1986) .................................................................................. 9

28

*United States v. Rogers*,
    781 F. Supp. 1181 (S.D. Miss. 1991) ............................................................ 19, 20

*United States v. Rosen*,
    365 F. Supp. 2d 1126 (C.D. Cal. 2005) ..................................................................... 9

*United States v. Sherwood*,
    38 F.R.D. 14 (D. Conn. 1964) ...................................................................... 1, 22, 24

*United States v. Stehl*,
    2013 WL 12170491 (C.D. Cal. Nov. 27, 2013) ............................................... 9, 18

*United States v. Timothy James Hunt and George William Hammer, SA CR 17-0742-JLS (Nov. 29, 2017)* ............................................................................. 13

*United States v. Watson*,
    599 F.2d 1149 (2d Cir. 1979) ................................................................................... 9

**Statutes**

18 U.S.C. § 3282 ............................................................................................... 23, 24

Travel Act ................................................................................................................. 1

**Other Authorities**

Rule 6(e)(4) ............................................................................................................... 9

1

<b><u>MEMORANDUM OF POINTS AND AUTHORITIES</u></b>

2 **I.    INTRODUCTION**

3      "To be a nation of law, and not subject to the whims of men, law must be

4 administered uniformly and objectively.  The United States of America has

5 sufficient power, prestige, and facilities to openly indict a criminal and bring him to

6 the bar of justice. It is not in keeping with our heritage, to destroy that image of

7 America, by a policy of lying in wait with a sealed indictment, after the criminal

8 statute of limitations has run . . . ." *United States v. Sherwood*, 38 F.R.D. 14, 20 (D.

9 Conn. 1964).

10      These words were spoken by Judge T. Emmet Clarie in 1964 but they apply

11 with equal force to the matter now before the Court. In late 2015 and early 2016,

12 the Government met with Dr. Gross and his counsel. Prosecutors explained that

13 they were conducting an investigation into various doctors and others at Pacific

14 Hospital in Long Beach ("Pacific Hospital") and that Dr. Gross was a target of their

15 investigation. They told him in no uncertain terms that he could either enter a plea

16 pre-indictment, or the next time they spoke with his attorney, it would be a

17 discussion about scheduling his arraignment. Dr. Gross politely declined the

18 Government's offer, maintaining his innocence. For the next two years, Dr. Gross, a

19 well-respected surgeon and expert witness, saw patients, testified in trials, and

20 traveled often, always returning to his home in Orange County. In short, he lived

21 openly and notoriously, in full view of the Government and readily accessible to all.

22      Then, unbeknownst to Dr. Gross, on January 23, 2018, almost five years after

23 executing a search warrant on Pacific Hospital and over two years after notifying

24 Dr. Gross that he was target of the investigation, the Government filed an

25 indictment against Dr. Gross. The Indictment alleged 14 counts of conspiracy, mail

26 and wire honest services fraud, and Travel Act violations (hereinafter referred to as

27 the "Indictment").

28

1        However, rather than simply call Dr. Gross' counsel as previously discussed,

2    the Government elected to take a very different tack. Prosecutors submitted a

3    request asking the Court to *seal* the Indictment. The purported basis for this request

4    was that Dr. Gross was a flight risk and even, possibly, a danger to the community,

5    who simply could not be trusted to appear in Court if he knew of the Indictment.

6    The Government asked the Court not to unseal the Indictment until Dr. Gross had

7    been arrested.

8        One would have thought, given the Government's professed concerns about

9    not being able to apprehend Dr. Gross and his potential for dangerousness, that

10    when the time came to unseal the Indictment – which the Government did not do

11    until May 18, 2018 – it would have sent agents to arrest Dr. Gross. However, the

12    Government did not bother – it simply called Dr. Gross' counsel to set up a self-

13    surrender date. And rather than moving for detention, the Government

14    recommended an unsecured bond of $50,000 for Dr. Gross, and even agreed to

15    expand the usual travel restrictions for him. On the day set for self-surrender, Dr.

16    Gross appeared as promised. He submitted his bond paperwork that same day, was

17    not made to spend a night in jail, and he has thereafter complied with all the terms

18    of his pre-trial release.

19        The Government's above-described behavior prompts several questions.

20    Why was it necessary to file Dr. Gross' Indictment under seal on January 23, 2018?

21    Why did the Indictment need to remain sealed until May 18, 2018? Why did the

22    Government state under oath that Dr. Gross was a flight risk when its conduct

23    always indicated that it anticipated Dr. Gross' voluntary appearance at his

24    arraignment?

25        The answer, of course, could not be clearer. The Indictment was filed on *the*

26    *very day* that the statute of limitations for one of the 14 counts against Dr. Gross

27    expired. In addition, during the period when the Indictment was under seal, the

28    statute of limitations on 11 out of the remaining 13 counts also expired. It seems

MOTION TO DISMISS
18-cr-00014-JLS-1

that the Government obtained the Court's approval to seal the Indictment in order to improperly preserve the statute of limitations for all of those counts, while at the same time delaying notice to Dr. Gross until the Government was ready to proceed with its case.

Not only did the Government artificially manufacture an extension of the limitations period, it made a misstatement to the court in order to achieve that continuance. A misstatement as part of the adversarial process is bad enough, but here the misstatement was in an *ex parte* proceeding where the defense did not have a chance to correct the record. Further, this was a misstatement to convince the court not to inform the defendant of the filing of the Indictment.

This dubious practice finds no support in the Constitution and has, in fact, been the reason for courts to dismiss numerous indictments. Put simply, a court may only seal an indictment for a proper purpose, often termed a "legitimate prosecutorial objective." The sealing of an indictment to artificially extend a limitations period until the Government is prepared to move forward with its case is not a legitimate prosecutorial objective and thus not a proper purpose.

Such a practice undermines Dr. Gross' and other defendants' constitutional rights and prejudices their ability to properly defend their cases. Accordingly, when the Government seals an indictment without a proper purpose, the operative date for statute of limitations purposes is the date of unsealing, and any counts that fall outside the statute of limitations as a result are dismissed. Here, as explained more detail below, that must result in the Court dismissing 12 counts of this Indictment.

## II.   STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

As this Court is well aware, the Government has been conducting an investigation of doctors, administrators, and others who worked with Michael D. Drobot and Pacific Hospital of Long Beach, which he owned. The Government alleges that Mr. Drobot "ran a 15-year-long scheme in which he and others billed workers' compensation insurers and the U.S. Department of Labor hundreds of

millions of dollars for spinal surgeries and other procedures," and that Mr. Drobot paid kickbacks for the referral of those surgeries. U.S. Department of Justice Press Release No. 15-137 (November 24, 2015). This investigation became overt as early as April 2013, when the Government executed a search warrant on Pacific Hospital.

Almost three years later, in late 2015 and early 2016, in a series of meetings and telephone conversations between the Government, Dr. Gross, and his counsel, the Government told Dr. Gross in no uncertain terms that he was a target of its investigation and that unless he wanted to plead guilty at that time and cooperate, he would be indicted. *See* attached Declaration of Mark Mermelstein ("Mermelstein Decl."), ¶ 3.

Those 2015-2016 conversations with the Government also included conversations about whether Dr. Gross would be willing to self-surrender after being indicted. Mermelstein Decl., ¶ 4. At no time during these meetings and conversations did the Government do or say anything that indicated that it considered Dr. Gross to be a flight risk or that it was concerned that he knew about the investigation. Nor was there any suggestion that he posed a danger to the community. *Id.*

In addition, on February 8, 2016, in a related civil case, *State Compensation Insurance Fund v. Drobot, Sr., et al.*, SA CV 13-956-AG, the government filed several declarations under seal. In one such declaration, AUSA Joshua M. Robbins ("AUSA Robbins") informed the court that "[t]here are dozens of targets of the investigation." AUSA Robbins then set forth a list of names that included Dr. Gross. ECF Dkt. 980-4, ¶ 6. Although AUSA Robbins' declaration was filed under seal, the government voluntarily provided Dr. Gross' counsel with an unredacted copy of the declaration.

On April 27, 2016, Dr. Gross' counsel participated in a teleconference with AUSA Robbins, during which AUSA Robbins informed Dr. Gross' counsel that he would soon be leaving the U.S. Attorney's Office, and that attorneys already

1   assigned to the case – Joseph T. McNally ("AUSA McNally"), AUSA Ashwin

2   Janakiram ("AUSA Janakiram"), and AUSA Scott D. Tenley ("AUSA Tenley") –

3   would be handling the case going forward. Mermelstein Decl., ¶ 5.

4        For the next 20 months, Dr. Gross went about his normal routine. He saw

5   patients, testified at trials, traveled, and spent time with his family – all without

6   incident and without the promised Indictment. Then, on January 23, 2018, the

7   Government filed its 14-count Indictment against Dr. Gross, while also seeking and

8   obtaining permission to file the Indictment under seal. In its application to seal, the

9   Government asserted that "[t]he likelihood of apprehending the defendant might be

10  jeopardized if the indictment in this case were made publicly available before the

11  defendant is taken into custody on the indictment." Declaration of AUSA Janakiram

12  in Support of Government's *Ex Parte* Application for Order Sealing Indictment,

13  ECF Dkt. 6, p. 3, ¶ 2; Mermelstein Decl., ¶ 6, Exhibit A. The Government

14  requested that the Indictment remain sealed "until the defendant is taken into

15  custody on the charges contained in the indictment and the government filed a

16  'Report Commencing Criminal Action' in this matter." *Id*. at p. 3, ¶ 3.

17       It bears repeating that prior to filing the Indictment, the Government had

18  already told Dr. Gross that an indictment was coming, but had no plans to take Dr.

19  Gross into custody, having been satisfied by a representation from counsel that Dr.

20  Gross would self-surrender. Magistrate Judge Paul L. Abrams, who of course knew

21  nothing of this, signed the Government's proposed order on the day it was filed.

22  The order granted the Government's sealing application and ordered that the

23  Indictment "be kept under seal until such time as the government files a 'Report

24  Commencing Criminal Action' in this matter." Order Sealing Indictment and

25  Related Documents, ECF Dkt. 7; Mermelstein Decl., ¶ 7, Exh. B.

26       The Government also requested pretrial detention for Dr. Gross, on the

27  ground that "no condition or combination of conditions will reasonably assure: a.

28  the appearance of the defendant as required; b. safety of any other person and the

community." The Government asserted that it was entitled to a detention hearing because of a "serious risk defendant will flee." Government's Notice of Request for Detention, ECF Dkt. 4; Mermelstein Decl., ¶ 8, Exh. C.

Although the Indictment was filed in January, it was not until May 2018 that the Government first told Dr. Gross' counsel about the under-seal filing. Considering that the proffered justification for filing the Indictment under seal was to take "the defendant into custody on the charges contained in the indictment," one would have expected the Government to arrest Dr. Gross in this interim period. However, without first taking Dr. Gross into custody, on May 17, 2018, AUSA Tenley informed Dr. Gross' counsel that the Government would soon be unsealing an Indictment. Mermelstein Decl., ¶ 9. Contrary to what AUSA Janakiram had represented to Magistrate Judge Abrams in the Government's request to seal the Indictment just four months earlier, AUSA Tenley informed Dr. Gross' counsel that the Government intended to proceed by way of a summons as opposed to arresting Dr. Gross, and asked when they could schedule Dr. Gross' self-surrender. Dr. Gross' counsel and the Government ultimately agreed to hold Dr. Gross' arraignment on June 13, 2018. *Id*.

The following day, May 18, 2018, the Government filed its Request for Order Unsealing Indictment and Recalling Arrest Warrant. ECF Dkt. 14; Mermelstein Decl., ¶ 10, Exh. D. In that Request, the Government told the court that it had "informed defendant, through counsel, that the grand jury has returned an indictment charging him with violations of federal law . . . ." *Id*. at p. 3, ¶ 2. The Government then said that because it had told Dr. Gross' counsel about the Indictment, "the considerations requiring the indictments [sic] to remain under seal are no longer applicable." *Id*. The Government's May 18, 2018 filing did not explain how or why the Government's informing Dr. Gross' counsel of the Indictment's unsealing rendered its earlier concerns "no longer applicable," especially given the fact that Dr. Gross had been aware of the Government's

investigation of him for several years, had lived openly and notoriously since that time, and had at all times maintained his innocence and his desire to fight the charges in court.

In its Request for Order Unsealing Indictment, the Government informed the court that Dr. Gross had agreed to appear at the arraignment "via summons." The Government requested and obtained an order recalling the arrest warrant it asserted had been issued.[1] The Government then said that "a summons is sufficient to obtain defendant's appearance in this matter." Mermelstein Decl., Exh. D, p. 3, ¶ 3. Dr. Gross' counsel was soon served with a Summons to Appear requiring Dr. Gross to answer to the Indictment on June 13, 2018. ECF Dkt. 17.

Once again, the Government never explained to the court why a summons would be sufficient to secure Dr. Gross' appearance in court, when five months earlier, the Government had told the court something very different – that there was no way to ensure that Dr. Gross would appear to answer the charges against him, and had labeled Dr. Gross a flight risk. The Government previously requested that the Indictment remain sealed until Dr. Gross was taken into custody and the government filed a "Report Commencing Criminal Action." Declaration of AUSA Janakiram in support of *Ex Parte* Application, ECF Dkt. 6, p. 3, ¶ 3; Mermelstein Decl., ¶ 6, Exh. A. However, neither of those acts took place before the Government sought to unseal the Indictment. The Government never sought to take Dr. Gross into custody at any time; it simply called Dr. Gross' counsel and asked what day Dr. Gross would like to appear.

Not surprisingly, Dr. Gross showed up in court on June 13, 2018, with counsel, as promised. At that time, the Government did *not* move for detention as it had indicated it would, it did not raise any concerns regarding Dr. Gross' future

---

[1] ECF Dkt. 12. Counsel for Dr. Gross has been unable to confirm that a warrant for Dr. Gross' arrest was ever issued, and the docket in this matter does not show that a warrant was ever issued. The Government never attempted to arrest Dr. Gross at any time.

appearances, and instead it requested a $50,000 unsecured appearance bond from Dr. Gross alone. ECF Dkt. 21. The Government also agreed to modify the bond-related travel restrictions, which usually restrict defendants to travel within the Central District of California, so as to allow Dr. Gross to travel throughout all of California and Nevada.

In short, the Government did not do anything, by word or deed, which suggested a genuine belief that Dr. Gross was a flight risk, that he was a danger to the community, or that he would not attend future court appearances, the Government's original reasons supporting its request to seal the Indictment. To the contrary, it is quite clear that the Government's reason for sealing the Indictment was simply to preserve the almost-expired statute of limitations that applied to the majority of the counts against Dr. Gross.

## III.   ARGUMENT

The rules at issue in this Motion are not complex. The Government must file an Indictment within the statute of limitations for the offenses charged. If the Indictment is sealed for a proper purpose, the statute of limitations is tolled until it is unsealed. If it is sealed for an improper purpose, however, the date of unsealing becomes the operative date for analyzing the statute of limitations. Here, the Government sealed the indictment for an improper purpose – to artificially extend the statute of limitations – because it was not ready to proceed with the case. Thus, the unsealing date is the operative date for the statute of limitations, which means that 12 of the 14 counts in the Indictment must be dismissed.

### A.   The Indictment Was Improperly Sealed

"Generally speaking, the return of an indictment tolls the statute of limitations with respect to the charges contained in the indictment." *United States v. Bracy*, 67 F.3d 1421 (9th Cir. 1995) (*quoting United States v. Pacheco*, 912 F.2d 297, 305 (9th Cir. 1990)). This rule also applies to properly sealed indictments: "When an indictment is *properly* sealed, the return of the indictment by the grand

1  jury will toll the statute of limitations, even if the indictment is not unsealed until

2  after the limitations period has run." *United States v. Benavides*, 2009 WL

3  10679152 (D. Mt. Dec. 15, 2009) (emphasis added). In such cases, the indictment

4  will be deemed "found" for purposes of the statute of limitations when it is

5  returned, rather than when it is unsealed. *Benavides*, 2009 WL 10679152 at *3.

6    Where an indictment has been sealed for an *improper* purpose, however, the

7  limitations period will continue to run and the indictment will not be deemed

8  returned until it is unsealed and its contents are made public. *Id.* "[I]f the date of

9  unsealing is outside the limitations period, a violation of the statute of limitations

10  will result." *Bracy*, 67 F.3d at 1426.

11    After an indictment has been unsealed, a defendant may challenge the

12  propriety of the sealing under Rule 6(e)(4). In order to justify the sealing order, the

13  Government bears the burden of proof in showing that it obtained the order to seal

14  for a "legitimate prosecutorial reason." *United States v. Stehl*, 2013 WL 12170491,

15  *8 (C.D. Cal. Nov. 27, 2013); *Benavides*, 2009 WL 10679152 at *4 ("The burden is

16  on the government to show that the Indictment was properly sealed."); *United*

17  *States v. Deglomini*, 111 F. Supp. 2d 198, 200 (E.D.N.Y. 2000) ("The burden is on

18  the government to establish legitimate reasons for sealing the indictment if the

19  decision to seal is challenged ex post by the defendant.").

20    As the Ninth Circuit stated in *Bracy*, an indictment is "properly sealed" only

21  when it is sealed for "legitimate prosecutorial objectives." *Bracy*, 67 F.3d at 1426.

22  Such "legitimate prosecutorial objectives" include avoiding prejudicial pretrial

23  publicity with respect to a codefendant, *see United States v. DiSalvo*, 34 F.3d 1204,

24  1218 (3d Cir. 1994), avoiding compromising ongoing criminal investigations, *see*

25  *United States v. Rosen*, 365 F. Supp. 2d 1126, 1135-36 (C.D. Cal. 2005), arranging

26  for witness protection and preventing defendants from fleeing, *see United States v.*

27  *Ramey*, 791 F.2d 317 (4th Cir. 1986), locating and gaining custody over all

28

defendants named in an indictment, *see United States v. Watson*, 599 F.2d 1149, 1155 (2d Cir. 1979), and preventing witness tampering, *see Bracy*, 67 F.3d at 1426.

There can be no serious dispute that none of those objectives were at play in this case. First, the Government asserted three reasons for sealing the Indictment: (1) there was a serious risk Dr. Gross would flee the jurisdiction if he were to become aware of the Indictment before he was taken into custody, (2) there was no possible way to assure that Dr. Gross would appear to answer the charges against him, and (3) Dr. Gross would otherwise endanger the community if he were informed of the Indictment against him.

None of these reasons holds water. Dr. Gross was not a flight risk, as he had already been told in no uncertain terms that he would be indicted and thereafter simply continued to live his life, including international travel, always returning to his home in the Orange County area. In fact, he maintained his innocence – both to agents and others – and expressed his desire to have his day in court on the allegations.

Similarly, the Government clearly did not believe that Dr. Gross would "not appear to answer the charges against him." In early 2016, the Government accepted without question a representation made through counsel that Dr. Gross would self-surrender in lieu of arrest. Further, there is simply no evidence whatsoever that Dr. Gross would "otherwise endanger the community" upon learning of the Indictment. To the contrary, Dr. Gross is a respected spinal surgeon with no criminal history who remains active in community events even to this day.

The Government never offered any other potential "legitimate prosecutorial objectives," nor could they. There has never been any concern about pre-trial publicity in this case, and the ongoing investigation could not be compromised, as Dr. Gross – and everyone else – already knew about it since as early as 2013 when the Government executed a search warrant, and a result of the series of press releases the Government issued, as well as the substantial press coverage the case

received. There has been no suggestion whatsoever of concerns with witness tampering or the need for witness protection. Further, there was never any concern over gaining custody of "other defendants in the Indictment," as there are no other defendants in the Indictment.

Accordingly, the record is devoid of any evidence supporting any "legitimate prosecutorial objective" for sealing the instant Indictment. By contrast, the record is replete with evidence that the Government needed to seal the Indictment to preserve the statute of limitations until it was ready to proceed with the case. In order to obtain such a sealing order, the Government asserted demonstrably false reasons for needing that relief, including that Dr. Gross was a flight risk or danger to the community.

The law is clear that dismissal of the time-barred counts is the proper, and only, remedy.

### B.    Similar Conduct Has Occurred in Other Pacific Hospital Cases

Unfortunately, a review of the procedural history of the Government's other indictments related to the Pacific Hospital investigation reveals that what happened to Dr. Gross is not unusual. To the contrary, it appears the Government has regularly been seeking – and receiving – permission to file indictments under seal, claiming such relief was needed in order to prevent defendants from fleeing, while in reality it was seeking to do so in order to sustain charges that would otherwise have expired while it prepared the cases for trial.

In each of the cases described below, the Government filed its indictment within days of the expiration of some of the asserted claims' limitations periods, and despite the Government's representations, it did not have a reasonable basis for believing that the charged defendant was or would be a flight risk, nor did it behave in a manner consistent with its alleged concerns that the defendants were flight risks.

1  |  **1.**   *United States v. Payne*, SA CR 17-0053-JLS-1 (June 6, 2017)

2  The Government filed its indictment against Dr. Payne, an orthopedic

3  surgeon, on June 6, 2017. Two of the counts in the three-count indictment were

4  based on acts that allegedly took place on June 8, 2012, meaning that the indictment

5  was filed *two days before* the limitations period on those two counts would have

6  expired. ECF Dkt. 1. The Government filed a superseding indictment on April 26,

7  2018, including an additional two counts based on conduct that occurred on April

8  29, 2013, meaning that the superseding indictment was filed three days before the

9  limitations period for the two new counts would have expired.

10  As in Dr. Gross' case, the Government sought its original and superseding

11  indictments against Dr. Payne under seal. ECF Dkt. 4, 15. In its *ex parte*

12  applications for permission to do so, the Government represented to the Court that

13  "Defendant Payne has not been taken into custody on the charge contained in the

14  indictment and has not been informed that he is being named as a defendant in the

15  indictment to be presented to the grand jury on June 6, 2017. The likelihood of

16  apprehending defendant might be jeopardized if the indictment in this case were

17  made publicly available before the defendant is taken into custody on the

18  indictment." ECF Dkt. 4, p. 3, ¶ 2; ECF Dkt. 15, p. 3, ¶ 2.[2] This is the same

19  representation that the Government made to the court in Dr. Gross' case.

20  On May 18, 2018, less than one month after the Government filed the first

21  superseding indictment under seal, the Government filed its request to unseal the

22  superseding indictment. Oddly, the Government requested to unseal the Indictment

23  in Dr. Gross' case on that same day. *United States v. Gross*, 18-CR-0014, ECF Dkt.

24  14. As in Dr. Gross' case, the government stated that it was now possible to unseal

25  Dr. Payne's indictment "[b]ecause the government has informed defendant's

26

27  ───────────────

[2]  The Government's *ex parte* application regarding the superseding indictment

28  against Dr. Payne is attached as Exhibit 1 to the concurrently-filed Request for
Judicial Notice in Support of Motion to Dismiss ("RJN").

counsel of pending charges," and thus "the considerations requiring the indictments to remain under seal are no longer applicable." ECF Dkt. 19, p. 3, ¶ 2; RJN Exh. 2. The Government also stated that an arrest warrant was no longer needed, as Dr. Payne had agreed to appear by summons. *Id.* at ¶ 3.

On June 4, 2018, Dr. Payne was served with a Summons to Appear for arraignment on June 14, 2018. ECF Dkt. 23. As with Dr. Gross, at the June 14, 2018 arraignment (which took place the day after Dr. Gross' arraignment), bond was ordered in the amount of a $50,000 unsecured appearance bond, the same as in Dr. Gross' case. As with Dr. Gross, there appears to be no valid explanation for why the Government, at the time it sealed Dr. Payne's indictment, believed that Dr. Payne was a flight risk and needed to be arrested before his indictment could be made public, but then four months later allowed Dr. Payne to self-surrender, and stipulated to a $50,000 unsecured appearance bond.

### 2. *United States v. Timothy James Hunt and George William Hammer, SA CR 17-0742-JLS (Nov. 29, 2017)*

The Government filed a sixteen-count indictment against two defendants, Dr. Hunt, an orthopedic surgeon, and Mr. Hammer, controller for Pacific Specialty Physician Management. Count Nine of that indictment addresses conduct that allegedly occurred on November 29, 2012, *five years to the day* before the filing of the indictment, and thus the last possible day on which the Government could have asserted Count Nine. ECF Dkt. 1, ¶ 44.

As in the other related cases described above, including Dr. Gross' case, the Government sought to file its indictment against these two defendants under seal. ECF Dkt. 9. In its *ex parte* application to do so, AUSA Janakiram represented to the Court that "[n]one of the charged defendants have been taken into custody on the charges contained in the indictment to be presented to the grand jury on November 29, 2017. The likelihood of apprehending defendants might be jeopardized if the indictment in this case were made publicly available before the defendant is taken

into custody on the indictment." ECF Dkt. 9, p. 3, ¶ 2; RJN Exh. 3. This is, once again, the same unsupportable justification for sealing that the Government asserted in Dr. Gross' case and in other related cases.

The Government further requested pre-trial detention of the defendants, and in its Notice of Request for Detention, the Government represented to the court that "no condition or combination of conditions" could reasonably assure the defendants' appearance in court as required. ECF Dkt. 4, p. 2; RJN Exh. 4. AUSA Janakiram further represented to the Court that there was a serious risk that the defendants would flee. *Id*. at p. 4. AUSA Janakiram made the exact same representation with regards to the flight risk status of these two defendants as he did in Dr. Gross' case, suggesting, at a minimum, a lack of the requisite individualized findings with regards to each defendant.

On June 25, 2018, the Government requested that the indictment be unsealed. ECF Dkt. 20; RJN Exh. 5. Once again, the Government stated that the defendants had asked to make their initial appearances via summons, and arrest warrants were no longer needed, meaning that for some unexplained reason it was no longer necessary for the defendants to be taken into custody before their indictment was unsealed.

However, unlike the other cases discussed herein, in the case against Dr. Hunt and Mr. Hammer, the Government fully admitted its awareness that the defendants were *not* flight risks. In his declaration in support of the Government's request to unseal the indictment, AUSA Janakiram stated that "[g]iven defendant's [sic] request to appear via summons and *the lack of any evidence suggesting that defendants Hunt and Hammer pose a flight risk*, the government further requests an order recalling the arrest warrants issued in the above-captioned case. This warrant is no longer needed." *Id*. at p. 3, ¶ 3 (emphasis added). The record remains devoid of any evidence that could justify why, at the time of the sealing, the Government represented that the defendants were flight risks, but a few months later,

1   acknowledged the "lack of any evidence" that they posed such a risk.  Moreover,

2   Dr. Hunt was thereafter released on just a $10,000 signature bond. *See* ECF Dkt. 27.

3          As is readily apparent, all of the aforementioned cases have several material

4   things in common. First, all were filed within days of the statute of limitations

5   expiring on counts contained in the indictments. Second, in all the cases, the

6   Government asserted a purported need to seal because the defendants posed a

7   serious risk of flight or non-appearance. Third, in each case, when the time came for

8   that alleged risk to present itself – the unsealing of the indictments – the

9   Government simply informed the defendants' counsel of the indictments' unsealing,

10  directly undercutting their purported basis for sealing them. Fourth, in all these

11  cases, the Government originally asserted the need to take defendants into custody

12  before unsealing the indictments, but in the end allowed the defendants to appear by

13  summons, and all the defendants showed up as promised. Finally, in each case, the

14  Government agreed to the defendants' release on nominal unsecured signature

15  bonds.

16         Accordingly, it is clear that in all of these cases, the Government's proffered

17  reasons for needing to seal these indictments were erroneous and were not actually

18  the "legitimate prosecutorial objectives" behind the Government's sealing requests.

19  Rather, it appears the Government was simply behind in its investigation and was

20  not ready to proceed, but needed to file the indictments in order to artificially

21  extend the statute of limitations.[3]

22         The law simply does not counsel or condone this practice, which presents

23  fundamental fair trial and due process concerns and has denied all of these

24  defendants the right to be free of stale claims.

25

26  [3]  It should perhaps come as no surprise that the Government was not ready to
    move forward with these cases after five years, and resorted to using inaccurate
27  representations of the defendants' risk of flight to improperly obtain a sealing
    order from the magistrate judge. As the Court may recall, the lead defendant in
28  this case, Mr. Drobot, had his sentencing delayed for years.

-15-

### C.     Courts Routinely Dismiss Improperly Sealed Indictments

The cases described above show that in connection with the Pacific Hospital investigation, the Government has repeatedly used the sealing mechanism to toll limitations periods for its benefit, to the detriment of the defendants who are forced to defend stale claims and the courts that are being misled by the Government's assertions. Unfortunately, these are not isolated incidents, and the Government appears to have a long history of sealing indictments in an improper attempt to toll limitations periods. In such cases, courts regularly find those sealing requests to be improper and therefore dismiss the affected counts of the indictments.

### 1.     *United States v. Cosolito*, 488 F. Supp. 531 (D. Mass. 1980)

The defendant in *Cosolito* moved to dismiss a three-count indictment on charges of giving money to IRS officials to influence them to resolve his outstanding tax liability. The indictment was returned on December 4, 1979, a few days before the five-year statute of limitations on those charges would have expired. The indictment remained sealed until February 4, 1980, a period of approximately five months.

The Government initially asserted that sealing was required because the defendant and co-defendant were a common link to another ongoing investigation and that exposure of their informant would prejudice the ongoing investigation. After an evidentiary hearing, however, the court held that neither of the Government's asserted reasons for sealing had any actual basis in fact, finding that the defendants actually were not a common link with another investigation, and that the informant had already been identified and exposed in the media. Based on these facts, the court concluded that the Government had sealed the indictment to preserve the limitations period.

Because tolling limitations period is not a proper basis for sealing, the court dismissed the indictment. "To allow the government in these circumstances to extend the statute of limitations, even for a short period of time, would seriously

undermine the role which statutes of limitations have traditionally served in protecting criminal defendants against the power of the government." *Cosolito*, 488 F. Supp. at 538.

### 2.   *United States v. Benavides*, 2009 WL 10679152 (D. Mont., Dec. 15, 2009)

In *Benavides*, the government sought to seal two indictments charging a conspiracy to distribute drugs, and while the government stated that it intended to maintain the sealing "pending the appearance of the defendants in court," it providing no other justification for the request. The court issued the sealing order but ordered the sealing only until the defendants were arrested, which the court further ordered occur within the following three weeks.

Notwithstanding the court's order, the defendants were not arrested and the indictments remained sealed for 18 months, during which time the limitations period for two counts of the indictment had expired. In response to the defendant's motion to dismiss, the government argued that the indictment was sealed in part because the investigation was ongoing. *Id*. at *5.

The court found this explanation unconvincing because the government had never attempted to add any more defendants to the case and could not identify any potential candidates for inclusion. *Id*. The court found that the government also "had the evidence and the witnesses it needed to go forward on the drug charges" as of the date of the original filling of the indictment. *Id*. at *11. In fact, when questioned, the prosecutor could not name "a single witness . . . that was not already known to the government at the time the original indictment was filed." *Id*. at *6.

The government also argued that the indictment was sealed in part to prevent other members of the drug conspiracy from fleeing and making the "government's cooperating prisoner witnesses fearful of reprisal from other inmates." *Id*. The court struck this argument because the government did not demonstrate any "specific acts of protection" that were undertaken within the previous 18 months to keep

1    witnesses safe. *Id.* at \*6. The court also considered the fact that the prosecutor had

2    told a grand juror, "I sought that indictment to beat the statute of limitations on the

3    drug charges." *Id.* at \*7.

4         In light of the overwhelming evidence, the court came to the "inescapable

5    conclusion" that the government "sealed the original indictment to toll the statute of

6    limitations." *Id.* at \*12. The court found that the indictment was improperly sealed

7    and dismissed the two counts in question as time-barred under the statute of

8    limitations.

9         **3.    *United States v. Stehl*, 2013 WL 12170491, at \*8 (C.D. Cal.,**

10        **Nov. 27, 2013)**

11        In *Stehl*, the government indicted the defendant for tax evasion crimes. The

12   government requested and was granted permission to seal the indictment even after

13   the prosecutor told the magistrate judge, "[W]e were running up against the statute

14   of limitations issue. So, I presented it, but the actual grand jury investigation is still

15   ongoing." *Id.* at \*1. The prosecutor also told the court that it didn't have an exact

16   address for the defendant and that, as a result, it might take some time to get the

17   defendant into custody.

18        The indictment was unsealed one year later after the defendant was arrested.

19   The defendant moved to dismiss one count of attempting to evade taxes, as the

20   statute of limitations for that offense had run while the indictment was under seal.

21        The district court found that neither of the government's asserted reasons for

22   sealing – an ongoing investigation and not having the defendant's exact address –

23   was a justifiable basis for sealing an indictment. "The government offers no

24   explanation, let alone a declaration or any other evidence, as to why its ongoing

25   investigation took another year or when it ultimately obtained Stehl's 'exact

26   address' . . . ." *Id.* at \*9. "The fact that the government was 'running up against the

27   statute of limitations' cannot provide a sufficient basis for sealing to enable the

28

-18-

1  government to continue its investigation into more serious charges." *Id*. at *8. The

2  court granted the defendant's motion to dismiss.

3  **4.**   ***United States v. Rogers*, 781 F. Supp. 1181 (S.D. Miss. 1991)**

4   In *Rogers*, a grand jury returned a three-count indictment charging the

5  defendant with bribing public officials shortly before the statute of limitations on

6  those counts was going to expire. At the government's request, the indictment was

7  sealed and remained sealed for 20 months. "According to the government, it wanted

8  the indictment to be sealed and remain sealed until the completion of the

9  investigation of alleged income tax violations, because it believed that the tax

10 investigation would result in future prosecutable tax offenses grounded in the

11 conduct that gave rise to the bribery indictment, and it intended to secure an

12 indictment and move to consolidate the bribery and tax offense indictments for

13 trial." *Id*. at 1184.

14  The defendant moved to dismiss the indictment on statute of limitations and

15 pre-indictment delay grounds. The court dismissed the indictment, finding

16 impermissible pre-indictment delay and also finding that the government did not

17 have a legitimate prosecutorial reason for sealing the indictment.

18  The government has not demonstrated that the sealing was necessary in order

19  to maintain secrecy. The government does not claim that the defendant could

20  not be located or was likely to flee. Moreover, the evidence is uncontroverted

21  that the defendant was aware of the bribery investigation as early as 1988 and

22  of the income tax investigation at least by April 1989. No evidence has been

23  presented to suggest that advising the defendant of the fact of the bribery

24  indictment would have adversely affected the government tax investigation.

25  The simple fact is that the government wanted to pursue its investigation into

26  what it perceived to be income tax irregularities with the hope of ultimately

27  indicting defendant on those additional charges and joining all the charges for

28  trial. . . .

*Id*. at 1191. The court stated that "[i]n short, this court cannot agree that a unilateral extension by the government of the limitations period under the guise of 'gathering evidence' would be a 'legitimate prosecutorial objective' . . . ." *Id*.

### 5.   *United States v. Gigante*, 436 F. Supp. 2d 647 (S.D.N.Y. 2006)

In *Gigante*, the government indicted the defendant in November 2003 for making false statements in a bankruptcy proceeding, fraudulent concealment, and income tax evasion. The government filed and sealed the initial indictment one day before the statute of limitations would have expired on all counts, and then filed a series of superseding indictments, each adding more charges just before their limitations periods would have expired. The final superseding indictment was not unsealed until August 2005, when Gigante was arrested. The applicable limitations periods had expired during the 21 months that the indictment had been sealed.

In response to the defendant's motion to dismiss, the government asserted that the sealing was needed in order to avoid compromising a related tax-evasion investigation, to prevent the defendant from fleeing and risking the safety of arresting officers, and to provide the government more time to investigate the defendant's assets for forfeiture purposes. *Id*. at 652-53, 657. However, the court rejected all of the Government's asserted justifications for sealing.

> The Government's assertion that it needed to maintain secrecy rings
> hollow in light of the fact that . . . there was nothing "secret" about the
> investigation: Gigante was well aware for nearly the entire duration of
> the five-year investigation that he was being investigated, and his
> counsel was in frequent contact with the Government about the
> investigation. . . . The Government's contention that Gigante posed a
> flight risk or a risk to the safety of arresting officers is similarly not
> substantiated. Gigante's whereabouts were never unknown, he
> repeatedly volunteered to meet with the Government prior to being
> indicted, he asked that he be allowed to surrender if he were indicted

1    rather than being arrested on the street or in front of his children, and he

2    notified the FBI when he traveled outside of the jurisdiction even before

3    he was aware that he had been indicted. . . . Thus, the Government's

4    motivation for sealing the indictments could not have been secrecy, fear

5    of flight, or safety of the arresting officers, and the Court can only

6    reasonably conclude that the indictments were sealed only because the

7    Government sought to toll the statute of limitations while pursuing a

8    related investigation.

9    *Id*. at 657. The court granted the defendant's motion to dismiss the indictment.

10       In all of these cases, federal courts determined that the government had

11   obtained permission to seal indictments without having a legitimate prosecutorial

12   reason for doing so, and as a result, dismissed the affected counts. The facts in Dr.

13   Gross' case mirror many of the facts those courts noted in their decisions: Dr. Gross

14   was always aware of the Government's investigation, which had received a great

15   deal of media publicity. He was aware he would be indicted, his counsel was in

16   regular contact with the Government about his case, and he was always prepared to

17   voluntarily appear to answer the Indictment.

18       In the present case, the Government has sealed the Indictment for an

19   improper purpose, and as in the cases described above, the affected counts of the

20   Indictment must be dismissed.

21   **IV.    CONCLUSION**

22       "Criminal limitations statutes are to be liberally interpreted in favor of

23   repose." *Toussie v. United States*, 397 U.S. 112, 115 (1970). "[S]uch statutes

24   represent a legislative judgment about the balance of equities in a situation

25   involving the tardy assertion of otherwise valid rights: 'The theory is that even if

26   one has a just claim it is unjust not to put the adversary on notice to defend within

27   the period of limitation and that the right to be free of stale claims in time comes to

28

prevail over the right to prosecute them.'" *United States v. Marion*, 404 U.S. 307, 322 n.14 (1971).

In addition, the law is clear that if an improperly sealed indictment results in a violation of the statute of limitations, "prejudice is presumed and dismissal is automatic." *Benavides* at *12. *See also*, *United States v. Sherwood*, 38 F.R.D. 14 (D. Conn. 1964) (presuming prejudice from sealing and dismissing indictment). This rule constitutes sound public policy – "[i]f the rule were to the contrary, 'even a patently unjustified delay of virtually limitless duration would toll the limitations period, so long as the defendant is unable to meet the burden of proving actual prejudice to his defense as a result of the delay.'" *Benavides*, at *12. *See also*, *Deglomini*, 111 F. Supp. 2d at 200 ("Where the government has no legitimate purpose served by keeping the indictment sealed beyond the expiration of the limitations period, the defendants need not show prejudice, even if the indictment was properly sealed initially.").[4]

Here, there can be no serious dispute that the Government obtained the sealing orders in this case for an improper purpose. Prosecutors told Magistrate Judge Abrams that if the Indictment were not sealed and Dr. Gross learned of it, he would pose a risk of non-appearance and a danger to the community. At the same time, however, the Government knew that it had already informed Dr. Gross that he would be indicted and had even confirmed that he would self-surrender.

---

[4] Although case law is clear that a showing of prejudice is not required, it bears noting that Dr. Gross has in fact suffered prejudice. During most of the time that Dr. Gross was under criminal investigation, he was also negotiating the terms of a divorce. It was apparent that Dr. Gross' being charged would have a substantial impact on the financial result in the divorce. Once April 2018 passed, and having not heard from the Government since 2016, Dr. Gross agreed to a divorce settlement that required him to make a lump sum settlement payment rather than regular smaller payments over time. If Dr. Gross had been informed of the Indictment when it was initially filed, he would have made other settlement arrangements so as to be prepared to make a substantial outlay of funds for his defense, including costs for attorneys, investigators, electronic discovery, and similar case expenses.

Moreover, just four months later when the Indictment was unsealed, the Government in fact did just that – it contacted Dr. Gross' counsel, arranged for a self-surrender, and Dr. Gross appeared as promised. The Government even agreed to an unsecured bond and limited travel restrictions, all of which acts serve to undermine the proffered reasons for needing a sealing order. The only plausible explanation for the sealing request is that the Government needed to artificially toll the statute of limitations so that it could proceed with the case on its own schedule – clearly not a "legitimate prosecutorial objective," and a direct violation of Dr. Gross' fundamental rights.

In this case, 12 of the 14 counts in the Indictment are alleged to have taken place between January 23, 2013 and May 14, 2013. The Indictment was filed on January 23, 2018, exactly five years after the earliest alleged act. The Indictment was unsealed on May 18, 2018, outside the statute of limitations given the last alleged improper act for those 12 counts.[5] Thus, because the Government did not have a legitimate prosecutorial objective in sealing the Indictment, the Court should dismiss those 12 counts.

Specifically, the only two counts that the Government may still arguably assert, that did not expire while the Indictment was improperly under seal, are (1) the conspiracy count, which alleges overt acts occurring between February 1, 2008 and May 30, 2013,[6] and (2) Count Nine which alleges a wire transmission that took place on May 29, 2013.

In summary, the Government may not obtain a sealing order simply to preserve the statute of limitations. When it does, such an order is for an improper

---

[5]   18 U.S.C. § 3282 ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").

[6]   It should be noted that the penultimate overt act the Government alleges in support of its conspiracy count occurred on May 14, 2013. Had it not been for the Government's allegation of a May 30, 2013 overt act, the conspiracy count also would have expired while the Indictment was under seal.

-23-

1    purpose, mandating dismissal of any counts that expire during the period between

2    filing and unsealing. As noted at the outset, while this may be a serious remedy, the

3    courts have artfully articulated why such a rule is so important:

4           The five-year criminal statute of limitations would have little or no

5           meaning were the law to be construed otherwise. A person would never

6           know with certainty that a sealed indictment might be lurking in

7           undisclosed government files, held in abeyance for a year or years to

8           satisfy the personal motives of a government official. To be a nation of

9           law, and not subject to the whims of men, law must be administered

10          uniformly and objectively. The United States of America has sufficient

11          power, prestige, and facilities to openly indict a criminal and bring him

12          to the bar of justice. It is not in keeping with our heritage, to destroy

13          that image of America, by a policy of lying in wait with a sealed

14          indictment, after the criminal statute of limitations has run . . . ."

15   *Sherwood*, 38 F.R.D. at 20.

16          Accordingly, for all of the foregoing reasons, Dr. Gross respectfully requests

17   that the Court dismiss with prejudice Counts 2-8 and 10-14 of the Indictment for

18   violating the applicable statute of limitations. *See* 18 U.S.C. § 3282.

19

20   Dated: September 28, 2018          MARK MERMELSTEIN

21                                      MONA S. AMER
                                        Orrick, Herrington & Sutcliffe LLP

22                                      HAMILTON E. ARENDSEN

23                                      Arendsen Cane Molnar LLP

24

25                                      By: _____

26                                          MARK MERMELSTEIN
                                            Attorneys for Defendant

27                                          JEFFREY DAVID GROSS

28

---

-24-

## <u>DECLARATION OF MARK MERMELSTEIN</u>

I, Mark Mermelstein, declare and state as follows:

1.      I am a member of the bar of the State of California, admitted to appear before this Court, and a partner in the law firm of Orrick, Herrington & Sutcliffe LLP ("Orrick"), attorneys of record for defendant Dr. Jeffrey David Gross ("Dr. Gross"). I am familiar with the events, pleadings, and discovery in this action and, if called upon as a witness, could and would testify competently to the matters stated herein of my own personal knowledge.

2.      I submit this declaration in support of Dr. Gross' Motion to Dismiss on statute of limitations grounds.

3.      In late 2015 and early 2016, Dr. Gross, Mark Indeglia and I engaged in a series of meetings and telephone conversations with the Government about their investigation of Dr. Gross. In those discussions, I was told that Dr. Gross was a target of the Government's investigation, and unless Dr. Gross intended to plead guilty at that time and agree to cooperate with the Government's investigation, the Government would soon indict him.

4.      During those discussions, the Government also asked whether Dr. Gross would be willing to self-surrender after being indicted. At no point during those discussions did the Government indicate that it considered Dr. Gross to be a flight risk or a danger to the community, or that it was concerned that Dr. Gross was aware of the Government's investigation.

5.      On April 27, 2016, I participated in a teleconference with AUSA Joshua M. Robbins ("AUSA Robbins"), during which AUSA Robbins informed Dr. Gross' counsel that he would soon be leaving the U.S. Attorney's Office, and that attorneys already assigned to the case – Joseph T. McNally ("AUSA McNally"),

1   AUSA Ashwin Janakiram ("AUSA Janakiram"), and AUSA Scott D. Tenley

2   ("AUSA Tenley") – would be handling the case going forward.

3        6.    Attached hereto as Exhibit A is a true and correct copy of the

4   Government's *Ex Parte* Application for Order Sealing Indictment of Dr. Gross,

5   ECF Dkt. 6.

6        7.    Attached hereto as Exhibit B is a true and correct copy of the Court's

7   Order Sealing Indictment and Related Documents, ECF Dkt. 7.

8        8.    Attached hereto as Exhibit C is a true and correct copy of the

9   Government's Notice of Request for Detention of Dr. Gross, ECF Dkt. 4.

10       9.    On May 17, 2018, I was informed by AUSA Scott Tenley that the

11  Government would soon be unsealing an indictment against Dr. Gross. AUSA

12  Tenley informed me that the Government intended to proceed by way of summons

13  as opposed to arresting Dr. Gross, and asked when he could schedule Dr. Gross'

14  self-surrender. We agreed that Dr. Gross' arraignment would take place on June 13,

15  2018.

16       10.    Attached hereto as Exhibit D is a true and correct copy of the

17  Government's Request for Order Unsealing Indictment and Recalling Arrest

18  Warrant.

19

20       I declare under penalty of perjury under the laws of the United States that the

21  foregoing is true and correct.

22

23       Executed this 28th day of September 2018, at Los Angeles, California.

24

25

26                                      Mark Mermelstein

27

28