MARK MERMELSTEIN (STATE BAR NO. 208005)
mmermelstein@orrick.com
MONA S. AMER (STATE BAR NO. 187090)
mamer@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA  90017-5855
Telephone:  +1 213 629 2020
Facsimile:   +1 213 612 2499

HAMILTON E. ARENDSEN (STATE BAR NO. 212844)
harendsen@arendsenlaw.com
ARENDSEN CANE MOLNAR LLP
550 West C Street, Suite 1150
San Diego, CA 92101

Attorneys for Defendant
JEFFREY DAVID GROSS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-cr-00014-JLS-1 |
| Plaintiff, | **DEFENDANT JEFFREY D. GROSS' NOTICE OF MOTION AND MOTION TO DISMISS INDICTMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| JEFFREY DAVID GROSS, | |
| Defendant. | Date:  March 22, 2019<br>Time: 11:30 a.m.<br>Courtroom 10A |
| | Hearing Time Estimate: 45 minutes |
| | Judge:   Josephine L. Staton<br>Date Action Filed:  01/23/2018 |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

PLEASE TAKE NOTICE that on March 22, 2019, at 11:30 a.m., or as soon thereafter as the matter may be heard, Defendant Dr. Jeffrey D. Gross ("Dr. Gross"), through his attorneys of record herein, will and hereby does move this Court, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, for an order dismissing the indictment against Dr. Gross that was filed under seal on January 23, 2018, and unsealed on May 18, 2018. ECF Dkt. 1.

This Motion is made on the grounds that the Indictment fails to state an offense of honest services mail fraud or honest services wire fraud, 18 U.S.C. §§ 1341, 1343, 1346, fails to state a violation of the Travel Act, 18 U.S.C. § 1952(a)(3), and fails to state a conspiracy to commit the aforementioned crimes. This motion is based upon this Notice, the attached Memorandum of Points and Authorities, the complete files and records in this action, such oral and documentary evidence as may be presented at any hearing on this motion, and other authorities to be submitted in further briefing or at the time this motion is heard.

Pursuant to the Order Re Criminal Proceedings applicable to this case (ECF Dkt. 25), counsel for Dr. Gross has met and conferred with the U.S. Attorney's Office regarding the substance of this Motion. The parties are in agreement regarding the issues to be presented to the Court, and have determined that the scope of issues to be presented to the Court cannot be narrowed.

Dated: February 4, 2019

MARK MERMELSTEIN
MONA S. AMER
Orrick, Herrington & Sutcliffe LLP

HAMILTON E. ARENDSEN
Arendsen Cane Molnar LLP

By:_____/s/_____
MARK MERMELSTEIN
Attorneys for Defendant
JEFFREY DAVID GROSS

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................1

II.    ARGUMENT..............................................................................4

    A.    The Indictment Fails to State a Claim for Honest Services Fraud........5

        1.    The Government Fails to Allege Any Fiduciary Duty to Disclose Non-Medical Information to Patients .........................5

        2.    The Indictment Fails to Allege Actual or Intended Harm to Dr. Gross' Patients ...................................................10

        3.    The Alleged Omission is Not Material ....................................16

        4.    The Indictment Fails to Allege Actionable Mailings ..............18

    B.    The Indictment Fails to State Travel Act Violations ..........................21

        1.    Section 650 Does Not Prohibit Bribery ...................................22

        2.    Section 750 Does Not Constitute Bribery and In Any Event, the Government Fails to Properly Allege a Section 750 Violation ........................................................................24

    C.    The Conspiracy Charge Cannot Stand Alone ....................................24

III.    CONCLUSION ........................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyce Motor Lines, Inc. v. United States*,
   342 U.S. 337 (1952)........................................................................ 23

*California Arch. Bldg. Prods., Inc. v. Franciscan Ceramics*,
   818 F.2d 1466 (9th Cir. 1987) ......................................................... 6

*Chiarella v. United States*,
   445 U.S. 222 (1980)......................................................................... 6

*Cleveland v. United States*,
   531 U.S. 12 (2000)................................................................... 10, 16

*Horvath v. Keystone Health Plan East, Inc.*,
   333 F.3d 450 (3d Cir. 2003) ........................................................... 18

*Johnson v. Kindt*,
   158 F.3d 1060 (10th Cir. 1998) ........................................... 10, 16, 24

*Kann v. United States*,
   323 U.S. 88 (1944).................................................................... 19, 20

*Kolender v. Lawson*,
   461 U.S. 352 (1983)........................................................................ 23

*Moll v. U.S. Life Title Ins. Co.*,
   710 F. Supp. 476 (S.D.N.Y. 1989) ................................................. 22

*Neder v. United States*,
   527 U.S. 1 (1999)............................................................................ 16

*Parr v. United States*,
   363 U.S. 370 (1960)........................................................................ 20

*S.E.C. v. McCarthy*,
   322 F.3d 650 (9th Cir. 2003) .......................................................... 23

*Schmuck v. United States*,
   489 U.S. 705 (1989)........................................................................ 18

*Skilling v. United States*,
   561 U.S. 358 (2010)...................................................................................... 2, 22

*United States v. Adkinson*,
   158 F.3d 1147 (11th Cir. 1998) ........................................................... 19

*United States v. Boren*,
   278 F.3d 911 (9th Cir. 2002) ................................................................ 4

*United States v. Carpenter*,
   95 F.3d 773 (9th Cir. 1996) ................................................................ 16

*United States v. Cochran*,
   109 F.3d 660 (10th Cir. 1997) .................................................... *passim*

*United States v. D'Amato*,
   39 F.3d 1249 (2nd Cir. 1994) ........................................................ 13, 15

*United States v. DeVegter*,
   198 F.3d 1324 (11th Cir. 1999) ....................................................... 3, 13

*United States v. Dowling*,
   739 F.2d 1445 (9th Cir. 1984) ........................................................ 6, 14

*United States v. Ferber*,
   966 F. Supp. 90 (D. Mass. 1997)........................................................ 23

*United States v. Frost*,
   125 F.3d 346 (6th Cir. 1997) .............................................................. 3, 6

*United States v. Gibson Specialty Co.*,
   507 F.2d 446 (9th Cir. 1974) .............................................................. 21

*United States v. Jain*,
   93 F.3d 436 (8th Cir. 1996) ........................................................ *passim*

*United States v. Kaplan*,
   836 F.3d 1199 (9th Cir. 2016) ........................................................... 25

*United States v. Kincaid-Chauncery*,
   556 F.3d 923 (9th Cir. 2009) ............................................................. 10

*United States v. Lane*,
   474 U.S. 438 (1986)............................................................................ 18

*United States v. Lemire*,
   720 F.2d 1327 (D.C. Cir. 1983) ........................................................ 15

*United States v. Milovanovic*,
   678 F.3d 713 (9th Cir. 2012) ................................................ 5, 16, 17

*United States v. Morris*,
   2004 WL 1242736 (S.D. W.Va. June 4, 2004) ............................ 6, 7, 8

*United States v. Nukida*,
   8 F.3d 665 (9th Cir. 1993) .................................................................. 4

*United States v. Regent Office Supply Co.*,
   421 F.2d 1174 (2d Cir. 1970) ...................................................... 10, 11

*United States v. Sawyer*,
   85 F.3d 713 (1st Cir. 1996) ............................................................... 19

*United States v. Skeddle*,
   940 F. Supp. 11146 (N.D. Ohio 1996) ............................................... 6

*United States v. Smith*,
   934 F.2d 270 (1991) .......................................................................... 20

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987) ......................................................... 14, 15

*United States v. Tanke*,
   743 F.3d 1296 (9th Cir. 2014) .......................................................... 18

*United States v. United States Gypsum Co.*,
   444 U.S. 405 (1980) .......................................................................... 25

*United States v. Wynn*,
   684 F.3d 473 (4th Cir. 2012) ..................................................... 11, 15

*United States v. Zacher*,
   586 F.2d 912 (2nd Cir. 1978) ........................................................... 22

*United States v. Zuniga*,
   18 F.3d 1254 (5th Cir. 1994) ................................................ 10, 16, 24

**Statutes**

18 U.S.C. § 371 ............................................................................................ 25

18 U.S.C. § 1341 ....................................................................................... 1, 9

18 U.S.C. § 1343 ........................................................................................... 1

18 U.S.C. § 1346 ................................................................................. 2, 9, 16

18 U.S.C. § 1952 ................................................................................... *passim*

42 U.S.C. § 1320a-7b(b) ............................................................................. 1

Cal. Bus. & Prof. Code § 650 ............................................................. *passim*

Cal. Ins. Code § 750 ............................................................................ *passim*

Cal. Pen. Code §§ 67 ................................................................................. 23

Cal. Pen. Code §§ 67 - 68 ......................................................................... 22

Cal Pen. Code § 518 ................................................................................. 23

Cal. Pen. Code § 641.3 ........................................................................ 22, 23

**Other Authorities**

Fed. R. Crim. P. 7(c)(1) ............................................................................. 4

Fed. R. Crim. P. 12(b) ............................................................................... 4

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

In preparing its indictment of Dr. Gross, the Government faced a problem. Although it had already indicted several physicians who performed surgeries at Pacific Hospital of Long Beach ("PHLB"), the Government's options for charging Dr. Gross were severely limited due to the unusual facts of his medical practice. First, unlike almost every other physician the Government has charged, Dr. Gross' billings almost exclusively do not involve government or insurance money.[1] Most doctors the Government indicted performed surgeries that were billed to Medicare, other federal programs, or state workers compensation insurance carriers. Dr. Gross, however, performed spinal surgeries almost exclusively for private pay personal injury patients and did so "on a lien." In other words, Dr. Gross performed surgeries for patients injured in accidents who could not afford to pay for a surgery up front. Thus, he and PHLB both provided their services without any guarantee of payment.

Instead, these patients agreed to give Dr. Gross, PHLB, and other providers a lien against any recovery on their personal injury cases. If their cases ended without a recovery, Dr. Gross and PHLB usually received no payment for their services. If the patients did obtain a recovery, then Dr. Gross and PHLB got paid some portion of their billings out of that recovery. Thus, Dr. Gross did not receive payments from federal government programs and as a result, the Government could not charge Dr. Gross with violating the federal Anti-Kickback Act, 42 U.S.C. §1320a-7b(b).

Second, none of Dr. Gross' patients were deprived of any money or property. In fact, the vast majority of his patients received a needed surgery that they could not otherwise have obtained, and usually at a reduced price. Accordingly, the Government also could not charge Dr. Gross with mail or wire fraud pursuant to 18 U.S.C. sections 1341 and 1343.

---

[1] Similarly Dr. Gross was not sued by the plaintiff in the parallel civil litigation *State Compensation Ins. Fund v. Drobot Sr. et al.*, SACV 13-0956-AG & 15-1279-AG.

1   In light of the above, in order to charge Dr. Gross, the Government had to
2   improvise, and in the end it chose to charge Dr. Gross with honest services fraud
3   under 18 U.S.C. section 1346. As both the Government and the Court are aware,
4   however, the scope of that crime, particularly after *Skilling v. United States*, 561
5   U.S. 358 (2010), is narrow and typically involves public sector corruption. In this
6   case, however, the Government seeks to reach a much broader array of exclusively
7   private conduct. Specifically, the Government alleges that although Dr. Gross'
8   patients suffered no physical or economic harm, they were nonetheless defrauded
9   out of his honest services by not receiving information about contractual payments
10  Dr. Gross received from PHLB.

11       There is no authority for the Government's attempted expansion of honest
12  services fraud. In fact, to the contrary, in one of the few cases where the Government
13  sought to make such an argument, the Eighth Circuit rejected it outright. *See United*
14  *States v. Jain*, 93 F.3d 436 (8th Cir. 1996), *aff'd in part, rev'd in part*, 93 F.3d 436,
15  *cert. denied*, 520 U.S. 1273 (1997). In *Jain*, the Government accused a
16  psychotherapist of receiving kickbacks in exchange for placing his patients in a
17  particular hospital – a theory indistinguishable from the one the Government
18  advances here. On appeal, the Eight Circuit completely and eloquently rejected this
19  theory of culpability: "The essence of a scheme to defraud is an intent to harm the
20  victim" and if a psychotherapist "extract[s] undisclosed, unethical referral fees from
21  an interested third party provider, there is no independent evidence proving that he
22  thereby intended to defraud *his patients*." *Id*. at 442 (emphasis added). The Eighth
23  Circuit recognized that while a scheme to enrich a doctor through third party
24  payments could violate other state or federal laws, if the scheme is not intended to
25  result in patient harm, it does not constitute honest services fraud.

26       In making this ruling, the Eighth Circuit recognized the concerns inherent in
27  private sector honest services fraud prosecutions: "It is certainly true that the literal
28  language of § 1346 extends to private sector schemes to defraud another of the right

of 'honest services.' But the transition from public to private sector in this context raises troublesome issues." *Id*. at 441-42. The *Jain* court explained that when public officials are corrupted by a kickback, the essence of the political contract is violated. In such situations, the public really has lost an *intangible* right to honest services. But the same does not necessarily hold true in private sector cases. "[I]n the private sector, most relationships are limited to more concrete matters." *Id*. Decisions from other Circuits are in accord.[2] The Government's honest services allegations here fail to charge an offense for exactly the same reason that the Eighth Circuit reversed the honest services fraud conviction in *Jain*: The Indictment's allegations regarding how and when Dr. Gross' patients were defrauded, as sparse as they are, do not establish any intent to harm patients and thus cannot form the basis for honest services fraud.

The Government has also attempted to shoehorn alleged violations of state anti-referral fee laws into federal Travel Act violations. These allegations fare no better, however, as the federal Travel Act only brings within its ambit state law violations of "bribery, extortion and arson." Yet the Government does not, and cannot, allege any of those predicate crimes. The Government assumes that violations of California Business and Professions Code Section 650 and California Insurance Code Section 750 fall within the crime of "bribery" as that term is used in the Travel Act. This assumption lacks any legal support or justification, however, as these particular state law crimes are not bribery crimes and therefore cannot supply the basis for federal Travel Act offenses.

---

[2] *See, e.g.*, *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997) ("The right of the public to the honest services of its officials derives at least in part from the concept that corruption . . . violates 'the essence of the political contract.' Enforcement of an intangible right to honest services in the private sector, however, has a much weaker justification because relationships in the private sector generally rest upon concerns and expectations less ethereal and more economic than the abstract satisfaction of receiving 'honest services' for their own sake."); *United States v. DeVegter*, 198 F.3d 1324 (11th Cir. 1999) ("[S]uch a strict duty of loyalty ordinarily is not part of private sector relationships. Most private sector interactions do not involve duties of, or rights to, the 'honest services' of either party. Relationships may be accompanied by obligations of good faith and fair dealing, even in arms-length transactions.").

Finally, it is axiomatic that a person may not be guilty of conspiracy for agreeing to engage in conduct that is not itself illegal. Thus, due to the Government's failure to properly charge honest services fraud or a Travel Act violation, its conspiracy allegations also fail as a matter of law. Accordingly, Dr. Gross respectfully moves this Court for an Order dismissing all counts of the Indictment.

## II.    ARGUMENT

The Indictment does not state any offenses under federal law. Thus, the Court should dismiss it in its entirety. Federal Rule of Criminal Procedure 12(b) allows consideration at the pretrial stage of any defense "which is capable of determination without the trial of the general issue." *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993). Failure to state an offense is such a defense. An indictment "must be a plain, concise and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1). If not, a defendant may move to dismiss the indictment for failure to state an offense under Federal Rule of Criminal Procedure 12(b). Further, "[i]n ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).

The Indictment charges Dr. Gross with (1) honest services mail and wire fraud; (2) Travel Act violations; and (3) conspiracy to commit those offenses. It also alleges aiding and abetting and forfeiture with respect to those charges. As explained in detail below, the Indictment fails to state a claim for honest services fraud or violation of the Travel Act. Accordingly, it must be dismissed in its entirety, as the remaining counts and allegations depend on the existence of substantive charges.[3]

---

[3]    The Government and Dr. Gross have stipulated and agreed that the Court should hear both Dr. Gross' motion to dismiss on statute of limitations grounds and this Motion on March 22, 2019 to allow for efficient use of the Court's resources.

**A.    The Indictment Fails to State a Claim for Honest Services Fraud**

Dr. Gross is charged in Counts Two through Nine with honest services fraud. In order to find a defendant guilty of honest services fraud, the Government must prove each of the following elements beyond a reasonable doubt:

(1) the defendant devised or knowingly participated in a scheme or plan to deprive the victim of his right to honest services;

(2) the scheme or plan consisted of a bribe or kickback in exchange for the defendant's services;

(3) the defendant owed a fiduciary duty to the victim;

(4) the defendant acted with intent to defraud by depriving the victim of his right of honest services;

(5) the defendant's act was material – that is, it had a natural tendency to influence, or was capable of influencing a person's acts; and

(6) the defendant used, or caused someone to use, the mails to carry out or to attempt to carry out the scheme or plan. Ninth Circuit Jury Instruction 8.123;[4] *see also United States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012).

In light of these elements, it is clear that the Government's allegations of honest services fraud fail in a number of respects, specifically with regard to elements three through six.

**1.    <u>The Government Fails to Allege Any Fiduciary Duty to Disclose Non-Medical Information to Patients</u>**

In this case, the Government does not allege that Dr. Gross made any misrepresentations to his patients. Rather, the Indictment alleges that Dr. Gross concealed from his patients his receipt of contractual payments from PHLB. Indictment, ¶ 24. In fact, the Government's claims against Dr. Gross are all based on

---

[4]    Dr. Gross expressly reserves the right to argue that this instruction misstates the law with respect to honest services fraud in the private sector, as opposed to the public sector. *See*, *infra*, section C.

MOTION TO DISMISS INDICTMENT
18-CR-00014-JLS-1

his alleged failure to disclose certain payments. In order to properly plead honest services fraud in such cases, the Government must allege a fiduciary duty that covers the disclosure at issue. *See* Ninth Circuit Jury Instruction 8.123. The Government has not and cannot do so in this case.

It is well established that absent an independent duty, such as a fiduciary duty, simple failure to disclose cannot be the basis of a fraudulent scheme. Federal law governs the existence of fiduciary duty under federal fraud statutes. *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997). "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235 (1980); *California Arch. Bldg. Prods., Inc. v. Franciscan Ceramics*, 818 F.2d 1466, 1472 (9th Cir. 1987). Put differently, "[b]ecause the 'scheme to defraud of property or money' counts are based on what was not said (i.e., omissions), the defendants are culpable . . . only if the government proves the defendants had a duty to disclose their interest in the transactions." *United States v. Skeddle*, 940 F. Supp. 11146, 1149 (N.D. Ohio 1996). *See also*, *United States v. Dowling*, 739 F.2d 1445, 1450 (9th Cir. 1984), *rev'd on other grounds*, 473 U.S. 207 (1985). The Indictment's allegations fail to plead the requisite fiduciary duty.

In *United States v. Morris*, 2004 WL 1242736 (S.D. W.Va. June 4, 2004), the government charged the defendant, a doctor, with honest services wire fraud. The government alleged that Dr. Morris persuaded a patient to "invest in the defendant's medical practice and loan him money," and made false representations about the amount of money his medical practice would generate. *Id.* at *1.

The *Morris* court began its analysis by stating that "[t]o allege a scheme to deprive another of honest services in the context of a fiduciary relationship, an indictment must state that the defendant owed a fiduciary duty to the individual, that the defendant deprived that individual of an intangible right to honest services flowing from the duty, and that the individual was harmed by the deprivation." *Id.*

The court then focused on the scope of the fiduciary duty that Dr. Morris owed to his patient. "A fiduciary relationship exists between a physician and his patients based on the special knowledge a physician has concerning diagnosis and treatment, and thus a fiduciary relationship exists between Dr. Morris and [his patient]." *Id*. However, the court found that that duty only extended to the information that related to such diagnosis and treatment, which was the purpose of the parties' relationship:

> To charge a private sector defendant with honest services fraud under
> § 1346, an indictment must allege more than a breach of loyalty. The
> breach alleged must contravene the purpose of the parties' relationship.
> That is, the defendant must have deprived the victim of an intangible
> right to honest services that the victim was entitled to receive by virtue of
> the fiduciary relationship. The honest services a patient is entitled to
> receive from his physician are services related to medical diagnosis and
> treatment. Nowhere in Counts Four or Five is a statement suggesting that
> the defendant compromised the [patient's] medical care.

*Morris*, 2004 WL 1242736 at *2 (internal citations omitted). Thus, *Morris* stands for the proposition that just because the parties are in a fiduciary relationship, not every omission by a physician is a criminal violation of the federal honest services fraud statute. "Simple wire and mail fraud is not converted to honest services fraud by virtue of the fact that it is committed by the victim's physician." *Id*. To establish a duty to disclose, the right to honest services must "flow from" the doctor's fiduciary duty, or be encompassed within its scope.

Here, the Indictment fails to allege or even suggest why the doctor-patient relationship required Dr. Gross to disclose all non-medical information to his patients. The Indictment alleges that physicians owe a fiduciary duty to their patients, Indictment, ¶ 22, but does not allege that by virtue of Dr. Gross's fiduciary duty to his patients, he had a legal obligation to disclose to his patients the contractual payments at issue. The closest the Government comes to meeting this

pleading standard is a generic paragraph in the Indictment where the Government alleges that in general, "physicians owed a *fiduciary* duty to their patients, requiring physicians to act in the best interest of their patients and not for their own professional pecuniary or personal gain" and that "[p]hysicians owed a duty *of honest services* to their patients for decisions made relating to the medical care of those patients, including the informed choice of whether to undergo surgery and other medical procedures, as well as the selection of a provider and facility for such surgeries and procedures." Indictment, ¶ 22 (emphasis added). Notably, the Government does not allege that physicians owed patients a duty to disclose their financial relationships with the hospitals where they operated.

To the contrary, even the Government's recitation of the fiduciary duty confines its scope to disclosures "relating to medical care of those patients." *Id.* This is consistent with *Morris*, *supra*, 2004 WL 1242736 at *2 ("The honest services a patient is entitled to receive from his physician are services related to medical diagnosis and treatment."), and *Jain*, *supra*, 93 F.3d at 442. And while the Government appears to agree with Dr. Gross's view of the scope of his fiduciary duty, it nonetheless applies a much broader alleged "honest services" duty to encompass the information at issue. However, as stated above, the alleged conduct only violates honest services law if the fiduciary duty requires disclosure.

This view of the scope of a doctor's fiduciary duty comports with sound public policy. Where a surgery takes place, particularly when performing surgeries on a lien, is dictated by a variety of factors which have little to do with the doctor's specialized knowledge as a physician – the actual basis for the doctor's fiduciary duty. For example, the surgical center must agree to the financial arrangement with the patient, whether cash, health insurance, or a lien on a personal injury lawsuit. The surgeon must be credentialed at the surgical center, which must be properly equipped for the type of surgery at issue. The surgeon must be comfortable operating there, and with other health care providers, such as anesthesiologists and nurses who

also must be credentialed at that surgical facility. Against this backdrop of factors, it is hard to imagine how a physician's failure to volunteer some of this non-medical information would constitute a violation of federal criminal law. Rather, sound public policy and due process dictate that physicians have a framework within which to evaluate the scope of their fiduciary duty. Information relating to medical diagnosis and treatment provides that guidepost.

The Tenth Circuit tackled this issue in connection with a private sector investment fraud scheme and noted the fact that Government could not point to any law requiring the disclosure of the fee at issue. In *United States v. Cochran*, 109 F.3d 660 (10th Cir. 1997), the defendant was convicted of wire fraud for failing to disclose receipt of a commission fee for brokering a collateralized guaranteed investment contract. On appeal, Cochran contended that it was error to construe section 1343 to criminalize nondisclosure of fees in the absence of proof of a duty to disclose such information, and also error to construe section 1346 to criminalize nondisclosure in the absence of proof that knowledge of the fee would tangibly affect the alleged victim. Cochran further contended that retroactive imposition of a duty to disclose information in a private business transaction as a predicate for criminal liability is a deprivation of due process of law.

In reversing Cochran's conviction, the Tenth Circuit held that the government failed to show that Cochran had a duty to disclose the fee. The court also noted that the Government was unable to point to "any statute, regulation, common law or contractual provision that required disclosure of the fee." *Id*. at 665. "Assuming without deciding that § 1346 has application where a private actor or quasi-private actor is deprived of honest services in the context of a commercial transaction, it would give us great pause if a right to honest services is violated by every breach of contract or every misstatement made in the course of dealing." *Id*. at 667.

The same is true here. The Government does not (and cannot) point to any law or fiduciary duty requiring disclosure of the payments alleged. Furthermore, any

retroactive expansion of the scope of a physician's duty to mandate a disclosure of this type, upon penalty of criminal law, would deprive Dr. Gross of fair notice and be a violation of his Fifth Amendment due process rights. *See Johnson v. Kindt*, 158 F.3d 1060 (10th Cir. 1998) ("[t]he test for determining whether the retroactive application of a judicial decision violates due process is essentially one of foreseeability," and a judicial construction is unforeseeable if it is unexpected and indefensible by reference to the law expressed prior to the conduct at issue); *United States v. Zuniga*, 18 F.3d 1254, 1258 (5th Cir. 1994) ("[t]he Due Process Clause of the Fifth Amendment protects a defendant from retroactive application of unforeseeable judicial enlargement of criminal statutes"). Furthermore, any ambiguity concerning the ambit of the scope of a doctor's fiduciary duty should be resolved in favor of lenity. *See Cleveland v. United States*, 531 U.S. 12, 25 (2000).

### 2.    The Indictment Fails to Allege Actual or Intended Harm to Dr. Gross' Patients

As noted above, a specific intent to defraud is a required element of honest services fraud. *See United States v. Kincaid-Chauncey*, 556 F.3d 923, 941 (9th Cir. 2009), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358 (2010). Thus, in order to properly plead honest services fraud, the Government must allege that the defendant acted with a specific intent to defraud. *United States v. Cochran*, 109 F.3d 660, 665 (10th Cir. 1997) (scheme to defraud requires fraudulent intent).

In the honest-services context, this means alleging that Dr. Gross intended to or did cause harm to his patients. In *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), the defendants were convicted of mail fraud based on their use of salesmen to solicit telephone orders for their stationery business. The government alleged that the salesmen made false representations when obtaining the phone orders; however, the misrepresentations did not go to the quality of the product being sold, but instead were misrepresentations made in order to "get by" secretaries answering the phones, in order to speak to a purchasing agent. The Court

1   began by questioning whether such a representation was actionable given the lack of
2   any actual or intended harm to the victim:

3       The government does not contend that the Regent-Oxford agents made
4       any false representations regarding the quality or price of their nationally
5       advertised merchandise. Nor is there any suggestion of material benefits
6       which the customer might expect from the transaction beyond the inherent
7       utility of the goods purchased and the discount price at which they were
8       offered. . . . We must, therefore, examine the government's theory that
9       fraud may exist in a commercial transaction even when the customer gets
10      exactly what he expected and at the price he expected to pay."

11  *Id*. at 1180.

12      The Second Circuit reversed the convictions, holding that "the purpose of the
13  scheme 'must be to injure,'" and finding that the government failed to meet its
14  "burden of showing that some actual harm or injury was contemplated by the
15  schemer." *Id*. at 1180. In other words, deception alone is not injury and the
16  Indictment must go further than merely alleging lying to, or withholding information
17  from, the alleged victim: "[T]o convict a person of defrauding another, more must be
18  shown than simply an intent to lie to the victim or to make a false statement to him."
19  *United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012).

20      Here, the Government alleges that Dr. Gross "knowingly and with intent to
21  defraud, devised, participated in, and executed a scheme to defraud patients of their
22  right to honest services . . . ." Indictment, ¶ 29. However, the Government does not
23  allege that Dr. Gross intended to cause his patients any harm. Moreover, the
24  Indictment fails to explain how patients were defrauded or harmed by Dr. Gross'
25  alleged receipt of payments. To the contrary, as in *Regents*, Dr. Gross' patients got
26  exactly what they bargained for – an excellent surgery for an agreed-upon price.

27      The Indictment contains only one reference to any alleged harm, in a
28  paragraph alleging the "effects of the conspiracy." *See* Indictment, ¶ 25. Therein, the

Government alleges that "had patients known the true facts regarding the payment of kickbacks for the referral of Kickback Tainted Surgeries and Services performed at Pacific Hospital . . . patients would have more closely scrutinized a surgery or hospital service recommendation, would have sought second opinions, . . , would not have had the surgery or service performed, and/or would have insisted on a different hospital facility." Indictment, ¶ 25. In other words, at best, the Government speculates that "harm" to patients consisted of them possibly wanting to ask additional questions or electing not to get a surgery that no one disputes they needed. There is no allegation in the Indictment that Dr. Gross intended to cause his patients harm, and any harm that the Government does allege is not legally cognizable.

In the leading case analyzing the intent element of private sector honest services fraud in the doctor-patient context, the Eighth Circuit rejected the exact theory the Government relies on in this case. The court held that the receipt of kickbacks that incentivize a doctor to refer patients to a hospital and the concealment of those kickbacks from the patient *does not constitute honest services fraud because there is no intent to harm the patient*. See *Jain*, *supra*, 93 F.3d 436.

In *Jain*, the defendant, a psychologist, appealed his conviction for violating the mail fraud statute "by receiving payments from a psychiatric hospital for referring patients to that hospital." *Jain*, 93 F.3d at 438. The government's witnesses were former hospital administrators. "The first North Hills Administrator testified that his mid-1989 letter promising that North Hills would pay Dr. Jain $1,000 per month for 'marketing' was in fact an agreement to pay money for patient referrals." Further, "[t]he government conceded that each patient referred to North Hills was appropriately hospitalized. Several government witnesses testified that North Hills was likely the best acute-care psychiatric hospital in the region." *Id*. at 439. Witnesses also testified that Dr. Jain "put the patient's well-being as his highest priority. . . . [and] no witnesses claimed that any patient received unnecessary care or excessive hospitalization." *Id*.

"So far as the trial record reflects, Dr. Jain provided quality psychological services. Each hospitalized patient required hospitalization. North Hills was as good as or better than any alternative facility and provided his patients with proper care. And no patient was financially harmed by Dr. Jain's fee arrangement with North Hills." *Id*. at 441.

As the Eleventh Circuit described the ruling: "[Section] 1346 liability was rejected in *Jain* because although the defendant psychiatrist took referral fees from drug companies, the court concluded that he did not have the specific intent to defraud his patients of his fiduciary duty and that the nondisclosure of the fees was not a material harm to the patients because it did not affect the quality of their treatment." *United States v. Devegter*, 198 F.3d 1324 (11th Cir. 1999). "Here, all the evidence suggests that Dr. Jain intended to provide and did in fact provide his patients with the highest quality psychological services. While he also extracted undisclosed, unethical referral fees from an interested third party provider, there is no independent evidence proving that he thereby intended to defraud his patients." *Jain*, 93 F.3d at 442.

In short, the Eighth Circuit recognized two types of potential harm to the patients: harm related to the quality of medical services being provided by the doctor, and harm related to the cost of those services. The Eighth Circuit found no evidence that Dr. Jain intended to compromise either. *Id.* The Eighth Circuit joined the Second and Tenth Circuits in holding that since the essence of a scheme to defraud is an intent to harm the victim, "[w]hen there has been no actual harm [by virtue of the kickback scheme], 'the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent.'" *Jain*, *supra*, 93 F.3d at 442 (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2nd Cir. 1994)). *See also*, *United States v. Cochran*, 109 F.3d 660 (10th Cir. 1997) ("[I]n the absence of actual or potential harm, evidence independent of the alleged scheme must be adduced to show fraudulent intent towards the alleged victims").

-13-

1    The honest services fraud charges here fail for the same reasons they failed in
2 *Jain* and *Cochran* – the alleged injury from the scheme is not legally cognizable, and
3 there is no allegation that Dr. Gross intended to defraud his patients, contemplated
4 harm to his patients, or that any of his patients were actually harmed. As such, the
5 Indictment fails to properly charge an offense of honest services mail or wire fraud.
6 *See Jain*, *supra*, 93 F.3d 436.[5]

7    In recognition of the fact that Dr. Gross did not intend to cause and his
8 patients did not suffer either of the two heretofore legally cognizable types of harm –
9 monetary harm from overpaying for a surgery, or bodily injury from being subjected
10 to an unnecessary surgery – the Government proposes a third type of harm.
11 Specifically, the Government seems to suggest that patients lacked information that
12 may have caused them to change their behavior.

13    Not only is there no authority for expanding honest services fraud to
14 encompass such an amorphous type of "harm," this Court has already rejected this
15 type of harm in connection with its restitution analysis. *See* July 6, 2018 Criminal
16 Minutes, 8:14-cr-00034-JLS et al. (finding that recovery under the Mandatory
17 Victim Restitution Act requires either a loss of property or losses due to physical
18 injury). This Court recognized that there was a category of patients who neither
19 suffered property loss nor physical injury, as they received a medically necessary
20 surgery with no adverse medical consequences, and thus those patients had not
21 suffered a "harm" compensable by the MVRA. The same logic applies with regard
22 to these patients not suffering any cognizable harm supporting a fraud charge.

23

24 [5] *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984) (rejecting unlawful
conduct alone as basis for mail fraud), *rev'd in part on other grounds*, 473 U.S. 207
25 (1985); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (government is not
required to prove actual injury, but "must, at a minimum, prove that defendants
26 contemplated some actual harm or injury to their victims; only a showing of intended
harm will satisfy the element of fraudulent intent…. [m]isrepresentations amounting
27 only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead,
the deceit must be coupled with a contemplated harm to the victim.").
28

-14-

Not all harm is legally cognizable in a fraud prosecution. "To be convicted of mail fraud . . . , a defendant must specifically intend to lie or cheat or misrepresent with the design of depriving the victim *of something of value*." *Wynn*, *supra*, 684 F.3d at 478 (emphasis added). "The crux of these requirements is that the wire fraud statute only criminalizes breaches of duty that are accompanied by a misrepresentation or non-disclosure that is intended or is contemplated to deprive the person to whom the duty is owed of some *legally significant benefit*." *United States v. Lemire*, 720 F.2d 1327, 1335 (D.C. Cir. 1983) (emphasis added). Here, the Government has not alleged that patients were deprived of money or property, but rather that they were deprived of information.

Courts have recognized that not all information deprivations cause a legally cognizable injury for purposes of private sector honest services fraud. *United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) (although shareholders have a "right to control" the company, not all deprivations of information from the shareholders amount to legally cognizable private sector honest services fraud). Rather, in order for the alleged harm to be cognizable as fraud, it must relate to the nature of the bargain or service being provided. "The harm contemplated must affect the very nature of the bargain itself. Such harm is apparent where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *Starr*, *supra*, 816 F.2d at 98. Here, the Government does not allege that Dr. Gross' patients received any decrease in the "actual benefits delivered." To the contrary, they got exactly what they intended – a needed spinal surgery, usually at a reduced cost.

While the Government has alleged that patients were deprived of information, it has not alleged that patients actually suffered any harm that can be recognized as legally cognizable, nor that Dr. Gross intended or even contemplated that patients would suffer harm by being deprived of this information. Accordingly, the Government fails to allege the requisite intent to defraud for purposes of honest

services fraud. *See Jain*, *supra*. In light of *Jain*'s holding that failure to disclose a fee without either economic or bodily harm to the patient is not a violation of Section 1346, any retroactive re-interpretation of that holding would violate Dr. Gross' due process rights, and the rule of lenity. *See Johnson v. Kindt*, 158 F.3d 1060 (10th Cir. 1998); *United States v. Zuniga*, 18 F.3d 1254, 1258 (5th Cir. 1994); *Cleveland v. United States*, 531 U.S. 12, 25 (2000).

### 3.    The Alleged Omission is Not Material

The Government's honest services fraud charges also fail to allege a material omission. "[F]raud has always required that misrepresentations or omissions be material to be actionable." *Cochran*, *supra*, 109 F.3d at 668 n.3.[6] The Ninth Circuit has expressly adopted a materiality requirement, joining the Second, Fifth, Eighth and Tenth Circuits in doing so. *Milovanovic*, *supra*, 678 F.3d at 726-27 (citing *Rybicki*, *Gray*, *Jain*, and *Cochran*). "We agree with our sister circuits 'that § 1346 must be read against a backdrop of the mail and wire fraud statutes, thereby requiring fraudulent intent and a showing of materiality." *Id.* at 727.

While the Ninth Circuit adopted a materiality requirement for all honest services fraud cases, it recognized a distinction between private sector and public sector cases, and has thus far declined to opine on what the materiality test would be in a private sector case. *Id.* at 728. Recognizing the need to show fraudulent intent and that some deprivations of information (as opposed money or property) may not be sufficient to prove a violation in the private sector context, the Ninth Circuit has stated: "We do not need to decide whether in a private sector case there might be a requirement that economic damages be shown. Because [the case before the bench]

---

[6] *United States v. Carpenter*, 95 F.3d 773 (9th Cir. 1996) (Ferguson, J., dissenting) ("In all fraud cases (civil and criminal) only one kind of misrepresentation matters – a material representation . . . . Quite simply, not all lies support liability."); *see also Neder v. United States*, 527 U.S. 1, 25 (1999) ("[W]e hold that materiality of falsehood is an element of the federal [mail, wire,] and bank fraud statutes.").

1  involves honest services fraud committed against the public for which no economic

2  damages need be shown, we leave that question for another day." *Id* at 727.

3      In other words, when dealing with an alleged deprivation of information, the

4  Ninth Circuit expressed concern about what types of non-disclosures were legally

5  actionable. In the public sector cases, the Ninth Circuit has answered this question by

6  explaining that if the information "would naturally tend to lead to or is capable of

7  leading a reasonable [victim] to change his conduct," the deprivation of that

8  information is material. *Milovanovic,* supra, 678 F.3d at 727. But in private sector

9  cases, the Ninth Circuit has intimated that the definition of materiality needs to be

10  something more demanding.

11      There are several possibilities for what this more demanding standard might

12  look like. For one, the Court might hold that only deprivations of information that

13  cause economic harm can be considered material. This is the standard the Ninth

14  Circuit suggested it was open to in *Milovanovic*, and offers the benefit of more

15  clearly ascertaining whether a defendant had the requisite fraudulent intent.

16      Alternatively, it seems the Court might be guided by other circuits and adopt

17  the materiality test outlined by the Eighth Circuit in *Jain.* As noted above, in that

18  case involving a doctor/patient relationship, the Eighth Circuit determined that two

19  types of information would be potentially material to the patient: information

20  relating to the actual cost to the patient (economic harm), and information related to

21  the quality of the doctor's services (bodily harm).

22      The *Jain* court determined that the payment of referral fees to Dr. Jain did not

23  defraud his patients of their right to the doctor's honest services because the non-

24  disclosure at issue was not material to the patient under either theory. "True, Dr. Jain

25  did not disclose the referral fees, but a fiduciary's nondisclosure must be material to

26  constitute a criminal scheme to defraud. There is simply no evidence that any patient

27  would have considered Dr. Jain's relationship with [the third-party] material if it did

28  not affect the quality or cost of his services to that patient." *Jain*, 93 F.3d at 442.

1    In the instant case, under either test for materiality, the Government's
2    allegations fail. The Government alleges that if Dr. Gross' patients had known of the
3    payments, they "would have more closely scrutinized a surgery or hospital service
4    recommendation, would have sought second opinions . . . , would not have had the
5    surgery or service performed, and/or would have insisted on a different hospital
6    facility." Indictment, ¶ 25. Whether one agrees with the Ninth Circuit in requiring
7    that the information relate to economic harm, or the Eighth Circuit's definition of
8    materiality which finds representations regarding the quality of medical care
9    actionable, neither is satisfied here. There is no suggestion that patients would have
10   paid less if they received surgery elsewhere. In fact, because PHLB accepted these
11   surgeries on a lien, it is unlikely another facility could have provided the same
12   services for less, or even provided the services at all without upfront payment or
13   guaranteed payments such as from an insurer.

14   As noted, none of the Government's allegations relate to the quality of Dr.
15   Gross' medical care, nor is there any suggestion that he failed to provide his patients
16   with excellent spinal surgeries. Thus, the Indictment alleges an omission that, even if
17   made, would have been immaterial to the patient. *See Horvath v. Keystone Health*
18   *Plan East, Inc.*, 333 F.3d 450 (3d Cir. 2003) (finding HMO had no duty to disclose
19   physician incentives absent a request for the information, without being on notice
20   that the information was needed and absent evidence that the patient was harmed by
21   not having the information).

22   ### 4.    The Indictment Fails to Allege Actionable Mailings

23   The mailings and wires that the Government alleges cannot be used to satisfy
24   the mail and wire fraud statutes. For a mailing or wire to be the basis of a fraud
25   charge, it must "take place 'prior to the scheme's completion.'" *United States v.*
26   *Lane*, 474 U.S. 438 (1986); *United States v. Tanke*, 743 F.3d 1296 (9th Cir. 2014).
27   Similarly, in order for the mailing or wire to be "in furtherance of" the underlying
28   scheme, it must be "incident to an essential part of the scheme" or a "step in the

MOTION TO DISMISS INDICTMENT
18-CR-00014-JLS-1

plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989). A mailing furthers a scheme when "the mails are used prior to, and as one step toward, the receipt of the fruits of the fraud." *Kann*, *supra*, 323 U.S. at 94.

Here, the mails alleged fail to satisfy this requirement. The Indictment alleges "a scheme to defraud patients of their right to honest services of their physicians' performance of duties as treating physicians and medical providers by soliciting, offering, accepting, and paying bribes and kickbacks to induce the referral of [surgeries] to [PHLB]." Indictment, ¶¶ 29, 33. The gravamen of this allegation is that Dr. Gross concealed payments from his patients thereby defrauding them into having their surgeries at PHLB without having complete information. *See, e.g.*, Indictment, ¶ 24.b. (patients were defrauded of their right to honest services because, "[i]nfluenced by the promise of kickbacks, . . . Dr. Gross would cause patients . . . to have [surgery] at [PHLB]); *see also United States v. Sawyer*, 85 F.3d 713, 734 n.18 (1st Cir. 1996) (intended victims of scheme must be the ones defrauded).

These allegations confirm that the crime contemplated by the Government was completed prior to the mailings alleged in the Indictment. Given that the deprivation of information related to the location of surgery, the patients' alleged ability to more closely scrutinize the surgery recommendation, seek a second opinion, or not have the surgery performed at all ended once the surgeries were performed. At that point, the alleged scheme was complete and its object achieved – the patients had their surgeries at PHLB. *See Kann v. United States*, 323 U.S. 88 (1944) (reversing conviction because mail fraud scheme was completed prior to mailing).

More specifically, the mailings the Government alleges in the Indictment are mailings of claims for reimbursement from PHLB to the patients' personal injury attorneys, seeking payment for surgeries that had already taken place. However, by the time these claims were made, the scheme the Government alleges had already reached fruition, as the patients had already undergone surgery while unaware of the alleged payments. *United States v. Adkinson*, 158 F.3d 1147 (11th Cir. 1998) ("we

have not hesitated to reverse mail fraud convictions where the underlying scheme has reached fruition prior to the mailing").

In *Parr v. United States*, 363 U.S. 370 (1960), the defendants were charged with having obtained gasoline and other products and services for their own purposes by the unauthorized use of a gasoline credit card issued to the school district employing them. The oil company which furnished the products and services to the defendant would mail invoices to the school district for payment, and the school district's payments were made via checks sent in the mail. The high court found that there was not a sufficient connection between the mailing and the execution of the defendants' scheme, because it was immaterial to the defendants how the oil company went about collecting its payment. *See also*, *United States v. Smith*, 934 F.2d 270 (1991) ("[I]f a defendant has been able to take possession of the object of the fraud and if the fraud is then at an end, further mailings 'involve[ ] little more than post-fraud accounting among the potential victims of the various schemes, and the long-term success of the fraud [does] not turn on which of the potential victims [bears] the ultimate loss.'").

The same is true here. The Government has alleged that Dr. Gross engaged in a scheme to defraud patients out of their right to honest services by performing their surgeries at PHLB without disclosing payments received from the hospital. That alleged scheme was completed once the patients' surgeries were performed. The mailings that allegedly took place thereafter made no difference to the patients whose surgeries had already taken place.

This rule also comports with sound public policy. "The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann*, 323 U.S. at 95 (reversing mail fraud conviction where mailing was made after scheme was completed). The Government

fails to allege any mailings or wires made prior to the completion of the alleged scheme, requiring dismissal of the honest services mail and wire fraud charges.

### B.    The Indictment Fails to State Travel Act Violations

The Government's inclusion of five Travel Act charges attempts to stretch the law even further than its honest services fraud counts. The Government contends that California state statutes governing referral fees in the healthcare and insurance contexts constitute "bribes" within the meaning of the Travel Act. The Travel Act clearly does not extend so far.

In order to prove a Travel Act violation under 18 U.S.C. section 1952, the government must prove that the accused: (1) used the facilities of interstate commerce; (2) attempted to or did in fact promote, establish, or facilitate the carrying on of any one of the statutorily defined "unlawful activities"; and (3) formed a specific intent to promote, establish, or facilitate one of the prohibited activities. *See United States v. Gibson Specialty Co.*, 507 F.2d 446 (9th Cir. 1974); *see also* Ninth Circuit Jury Instruction 8.144.

The Travel Act does not make a federal crime out of all state law violations. Only specifically enumerated state law violations qualify as "unlawful activity" for purposes of the Travel Act. The Travel Act defines "unlawful activity" as (1) any business enterprise involving gambling, liquor . . . , narcotics or controlled substances . . . , or prostitution offenses . . . , (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) . . . any act which is indictable . . . under section 1956 or 1957 of this title . . . ."

The Indictment alleges violations of subsection (2) – that Dr. Gross engaged in use of "the mails and facilities of interstate commerce, with the intent to . . . carry on . . . an unlawful activity, namely, kickbacks and bribes in violation of California Bus. & Prof. Code Section 650 and California Ins. Code Section 750." Indictment, ¶ 37. However, neither code section prohibits "extortion, bribery, or arson."

1    **1.      Section 650 Does Not Prohibit Bribery**

2        California Business & Professions Code Section 650 ("Section 650") is in a

3    section of the Code entitled, "Unearned Rebates, Refunds and Discounts." It

4    regulates healthcare professionals licensed under that section of the Business and

5    Professions Code and prohibits the offer, delivery, or receipt of compensation or

6    inducement for referring patients, clients, or customers. Thus, by its plain language,

7    it targets only improper referral fees or kickbacks, not "bribes."

8        While the Government uses those terms interchangeably in order to bring

9    Section 650 within the purview of the Travel Act, the terms "kickback" and "bribe"

10   are legally distinct concepts. As a general principle, bribes are an inducement paid in

11   advance as a quid pro quo for some action which is illegal, unethical, or a breach of

12   trust. Kickbacks, on the other hand, are typically paid incrementally after the one

13   who receives the benefit gets paid and then pays or "kicks back" a portion to the

14   person who assisted the first party in obtaining such benefit.

15       Case law also recognizes that bribes and kickbacks are two different things.

16   *See Skilling v. United States*, 561 U.S. 358, 404 (2010) (paring down pre-McNally

17   cases to "cases involv[ing] fraudulent schemes to deprive another of honest services

18   through bribes *or* kickbacks supplied by a third party"); *United States v. Zacher*, 586

19   F.2d 912 (2nd Cir. 1978) (indictment originally charged defendant with receiving

20   kickbacks *and* bribes; government conceded that no showing of kickbacks had been

21   made); *Moll v. U.S. Life Title Ins. Co.*, 710 F. Supp. 476 (S.D.N.Y. 1989) (holding

22   that complaint alleged kickbacks but failed to state a claim of commercial bribery).

23       Furthermore, California actually has statutes that prohibit bribery. California

24   Penal Code sections 67 through 68 prohibit bribery of public officials, and sections

25   641.3 and 641.4 prohibit commercial bribery. Sections 650 and 750 simply do not.

26       It is also incongruous to group kickback crimes with bribery for purposes of

27   the Travel Act, since in California, extortion (including blackmail), bribery, and

28   arson – the three state crimes that can form the basis for a Travel Act prosecution –

-22-                                                  MOTION TO DISMISS INDICTMENT
                                                     18-CR-00014-JLS-1

1   are all specific intent crimes. *See* Cal. Penal Code §§ 67 (bribery); Cal. Penal Code

2   § 641.3 (commercial bribery); and Cal Penal Code § 518 (extortion). Section 650, on

3   the other hand, is a general intent crime. *See* Cal. Bus. & Prof. Code § 650.

4       As such, the Government certainly could have used actual bribery statutes as a

5   predicate for its Travel Act allegations if there were a factual basis for it, but there

6   isn't one here. The Government is accusing Dr. Gross of accepting kickbacks, not

7   bribes, and has consistently described Dr. Gross's conduct as a "kickback." In

8   describing the "manner and means of the conspiracy," the Government alleges that

9   "Drobot . . . would offer to pay and cause the payment of *kickbacks* to defendant

10   Gross . . . ." Indictment, ¶ 24.a. The surgeries Dr. Gross performed are referred to as

11   "*Kickback* Tainted Surgeries," *id*., Dr. Gross is included in the defined term, "Pacific

12   *Kickback* Recipients" *id*., and Dr. Gross is accused of being "[i]nfluenced by the

13   promise of *kickbacks*." *Id*. at ¶ 24.b. Allegations of kickback are simply not

14   sufficient for purposes of the Travel Act. *See United States v. Ferber*, 966 F. Supp.

15   90 (D. Mass. 1997) (holding that state gratuity statute did not constitute "bribery"

16   under Massachusetts law, and could not be a predicate offense under the Travel Act).

17       "It is a well-established canon of statutory interpretation that the use of

18   different words or terms within a statute demonstrates that Congress intended to

19   convey a different meaning for those words." *S.E.C. v. McCarthy*, 322 F.3d 650, 656

20   (9th Cir. 2003). Stretching the meaning of "unlawful activity" to include kickbacks,

21   when it is clear that kickbacks and bribes describe two different things, would result

22   in a due process violation under the vagueness doctrine. "To satisfy due process

23   under the vagueness doctrine a criminal statute must 'define the criminal offense

24   with sufficient definiteness that ordinary people can understand what conduct is

25   prohibited and in a manner that does not encourage arbitrary and discriminatory

26   enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 257 (1983). Similarly, a

27   "criminal statute must be sufficiently definite to give notice of the required conduct

28   to one who would avoid its penalties." *Boyce Motor Lines, Inc. v. United States*, 342

U.S. 337, 340 (1952). If kickbacks are deemed included in the definition of bribery for purposes of the Travel Act, when those terms otherwise have separate and distinct meanings, then the Travel Act will have failed to provide fair notice of the conduct it punishes and will violate Dr. Gross' due process rights. *See Johnson v. Kindt*, *supra*, 158 F.3d 1060; *United States v. Zuniga*, *supra*, 18 F.3d 1254, 1258.

## 2.   Section 750 Does Not Constitute Bribery and In Any Event, the Government Fails to Properly Allege a Section 750 Violation

California Insurance Code 750 ("Section 750") clearly does not apply to the Government's allegations in this case. Section 750 does not even contain the words "bribery" or "kickback." Rather, Section 750 prohibits anyone who engages in the practice of "processing, presenting, or negotiating insurance claims" from offering, or receiving any consideration as compensation or inducement for the referral or procurement of clients, cases, patients, or customers. Because a violation of Section 750 is not a state law bribery crime, a violation of Section 750 cannot be a predicate act for the purposes of the Travel Act.

In addition to not dealing with bribery, the Travel Act counts do not allege that Dr. Gross was engaged in the practice of "processing, presenting, or negotiating insurance claims," or had any involvement with insurance claims. To the contrary, that is exactly what makes this case so unique and distinguishes Dr. Gross from other defendants the Government has charged in its investigation. The surgeries at issue in these counts were performed on a lien, meaning that Dr. Gross' fee was substantially dependent on whether his patients obtained a recovery in their personal injury cases, and often accepted a reduced payment if the settlement did not cover all treatment.

For these various reasons, the Government's Travel Act charges must be dismissed for failing to charge a state crime within the Travel Act's ambit.

## C.   The Conspiracy Charge Cannot Stand Alone

In addition to the substantive counts for honest services mail and wire fraud and violations of the Travel Act, the Government also alleges that Dr. Gross

1  participated in a conspiracy to commit those federal criminal law violations.

2  Indictment, ¶ 23. "To prove a conspiracy under 18 U.S.C. § 371, the government

3  must establish: (1) an agreement to engage in the aforementioned federal criminal

4  law violations, (2) one or more overt acts taken to implement the agreement, and

5  (3) the requisite intent to commit the substantive crime." *United States v. Kaplan*,

6  836 F.3d 1199, 1212 (9th Cir. 2016). As argued above, the Government has not

7  alleged and cannot prove either of its substantive charges and thus cannot show any

8  agreement to violate these federal criminal laws.

9      First, with regard to honest services fraud, the Government failed to allege that

10  Dr. Gross' fiduciary duty extended to disclosure of non-health-related information,

11  that he had the specific intent to defraud his patients, i.e., to cause them harm, that

12  any of the alleged omissions were material, or that he used the mails to actually carry

13  out his purported fraudulent scheme. *See Jain*, *supra*, 93 F.3d at 441-42.

14      Second, the Government failed to properly allege any violations of the Travel

15  Act. As explained above, the Government cannot charge Travel Act violations based

16  on a California statute that does not criminalize either extortion, bribery, or arson. As

17  the Government has only relied on Sections 650 and 750, neither of which

18  encompasses bribery, it has failed to successfully plead a violation of the Travel Act

19  and thus cannot proceed with charges of a conspiracy to violate the Travel Act.

20      Because the Government has not alleged violations of the underlying criminal

21  laws, it is axiomatic that the Government has also failed to plead that Dr. Gross

22  formed an agreement to violate those same laws, or that he had the specific intent to

23  commit the underlying offenses. *United States v. United States Gypsum Co.*, 444

24  U.S. 405 (1980). Accordingly, the Court must dismiss the Government's conspiracy

25  charges as well.

## III.   CONCLUSION

27      Accordingly, for all of the foregoing reasons, Dr. Gross respectfully requests

28  that the Court dismiss all counts of the Indictment.

1    Dated: February 4, 2019            MARK MERMELSTEIN
                                        MONA S. AMER
2                                       Orrick, Herrington & Sutcliffe LLP

3                                       HAMILTON E. ARENDSEN
                                        Arendsen Cane Molnar LLP
4

5

6                                       By:  _____/s/_____
                                             MARK MERMELSTEIN
7                                            Attorneys for Defendant
                                             JEFFREY DAVID GROSS
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28