UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 8:18-CR-00014-JLS |
|---|---|
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS COUNTS 2-8 AND 10-14 OF THE INDICTMENT (DOC. 31)** |
| v. | |
| JEFFREY DAVID GROSS, | |
| Defendant. | **ORDER DENYING REQUEST TO CROSS-EXAMINE AGENT HABBEN** |
| | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT (DOC. 61)** |

This matter is before the Court on two defense motions. The first moves to dismiss twelve of fourteen counts of the Indictment based on a statute of limitations issue (Doc. 31, "MTD Certain Counts"). The second moves to dismiss all counts of the indictment, arguing that essential elements are lacking (Doc. 61, "MTD All Counts"). The Court denied the first at the hearing on March 22, 2019 and noted a formal order would follow. The Court took the second under submission. For the reasons stated in this Order, both motions are DENIED.

I. **Background**

Defendant Jeffrey David Gross is a neurosurgeon who was indicted as part of the Drobot/Pacific Hospital kickback conspiracy/fraud scheme. (*See generally* Doc.

1, Indictment.)  Defendant is alleged to have received kickbacks in exchange for referrals of patients needing spinal surgeries and other (usually invasive) procedures. (Indictment ¶ 24(a)-(k).)[1]  The Indictment alleges Defendant is associated with kickbacks totaling $622,936.  (¶ 26.)  The payments were allegedly disguised as payments pursuant to bogus contracts entered into for the purposes of disguising and concealing the kickback payments.  (¶ 24(h).)  The charges against Defendant involve kickbacks related to surgeries billed to personal injury attorneys rather than insurers, as Defendant performed surgeries contingent on a recovery through personal injury cases.  (¶24(a)-(c); *see also* MTD All Counts at 1.)

Based on these allegations, Defendant is charged with conspiracy, mail and wire fraud involving deprivation of honest services, and use of an interstate facility in aid of an unlawful activity.  The fraud scheme is alleged to have operated from 1997 to October 2013.  (¶ 1.) The overt acts in furtherance of the conspiracy that involved Defendant range from February 1, 2008 through May 30, 2013. (Indictment at 10-11 & 29.)  The Indictment was returned by the Grand Jury and filed on January 23, 2018. (*Id.*)

The Indictment was sealed the same day it was returned and filed.  (Doc. 7.)  In sealing the Indictment, the Magistrate Judge relied on the Government's Ex Parte Application to Seal ("Application").  (Doc. 6.)  The Application was supported by the prosecutor's Declaration, which stated:

> The defendant has not been taken into custody on the charge contained in the indictment to be presented to the grand jury on January 23, 2018.  The likelihood of apprehending the defendant might be jeopardized if the indictment in this case were made publicly available before the defendant is taken into custody on the indictment.

---

[1] Hereinafter, any paragraph number citations refer to the Indictment.

2

(Doc. 6, Janakiram Decl. ¶ 2.) The same day the Government filed the Indictment, it also filed its Notice of Request for Detention, claiming that no condition or combination of conditions would reasonably assure Defendant's appearance and safety of the public. (Doc. 4.) The Indictment remained sealed until May 18, 2018, when the Magistrate Judge unsealed it at the request of the Government. (Docs. 11-12.)

## II. Motion to Dismiss Certain Counts

Defendant moves to dismiss Counts 2 through 8 and 10 through 14 as untimely. The Government contends the statute of limitations was tolled from the time the Indictment was filed under seal and the time the seal was lifted, that is, from January 23, 2018 to May 18, 2018 ("the seal period").

### A. Statute of Limitations and Sealed Indictments

The limitations period as to all counts is five years. 18 U.S.C. § 3282(a). "Generally speaking, the return of an indictment tolls the statute of limitations with respect to the charges contained in the indictment." *United States v. Pacheco*, 912 F.2d 297, 305 (9th Cir. 1990) (citations omitted). However, sealed indictments toll the limitations period from the date of the return of the indictment only if that indictment was sealed for "legitimate prosecutorial objectives." *United States v. Bracy*, 67 F.3d 1421, 1426 (9th Cir. 1995). Otherwise, the tolling period begins with the indictment's unsealing.

In this case, if the Indictment was sealed and maintained under seal for legitimate prosecutorial objectives, then no count is barred by the statute of limitations. However, if the Indictment was not sealed or was not maintained under seal for any legitimate prosecutorial objective, then only Count 1 (conspiracy) and Count 9 (wire fraud involving deprivation of honest services) are timely.

### B. Issues Presented by Motion to Dismiss Certain Counts

The Government contends that legitimate prosecutorial objectives in this case tolled the statute of limitations during the seal period. Specifically, the Government

3

describes an ongoing criminal investigation and the ongoing involvement of cooperating witnesses, including covert activity by those witnesses. These reasons were not proffered by the Government when it sought the Magistrate Judge's Order to seal the Indictment. (*See* Doc. 6.) Nevertheless, the Government contends it need only demonstrate a legitimate prosecutorial objective after the fact, that is, once a defendant challenges the timeliness of charges brought in a case where the limitations period expired while the indictment was under seal. (Opp. at 20-21.)

### 1. After-the-Fact Consideration

As explained below, the Court agrees that the question of whether a sealed indictment tolls the limitations period is determined by a consideration of the record after a defendant challenges the sealing, which is necessarily after the seal is lifted.

The practice of sealing of indictments when they are returned by the Grand Jury and filed with the Court for the purpose of facilitating the arrest and arraignment of the charged defendant is routine and authorized by the Federal Rules of Criminal Procedure:

> (4) Sealed Indictment. The magistrate judge to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial. The clerk must then seal the indictment, and no person may disclose the indictment's existence except as necessary to issue or execute a warrant or summons.

Fed. R. Crim. P. 6(e)(4). Rule 6(e)(4) does not require that the Magistrate Judge develop a contemporaneous record justifying the sealing. *See United States v. Srulowitz*, 819 F.2d 37, 41 (2d Cir. 1987) (reversing the district court's dismissal of an indictment based on the absence of a contemporaneous record, and instead holding that the Government need only justify the sealing when challenged by a defendant after the unsealing of the indictment); *accord United States v. Sharpe*, 995 F.2d 49, 52 (5th Cir. 1993) (relying on *Srulowitz*). Indeed, three circuits have characterized the

sealing of an indictment under Rule 6(e)(4) as a "ministerial act." *Srulowitz*, 819 F.2d at 41 ("[S]ealing in the first instance is but a ministerial act, and it is wholly within the discretion of the Magistrate whether to require the prosecutor to justify a request to seal."); *States v. Sharpe*, 995 F.2d at 52 (same); *United States v. Lakin*, 875 F.2d 168, 171 (8th Cir. 1989) (same). The Magistrate Judge's determination to seal the indictment under this provision is given great deference. *See, e.g., United States v. Wright*, 343 F.3d 849, 856 (6th Cir. 2003); *United States v. Ramey*, 791 F.2d 317, 321 (4th Cir. 1986); *United States v. Edwards*, 777 F.2d 644, 649 (11th Cir. 1985); *United States v. Southland Corp.*, 760 F.2d 1366, 1380 (2d Cir. 1985); *United States v. Liersch*, No. 04CR2521, 2006 WL 6469421, at *2 (S.D. Cal. June 26, 2006); *contra United States v. Benavides*, No. CR 06-62-M-DWM, 2009 WL 10679152, at *7 (D. Mont. Dec. 15, 2009) (giving no deference to the decision of the Magistrate Judge where the under seal application was granted pursuant to the regular practice in the district).

Here, pursuant to Rule 6(e)(4), the Magistrate Judge sealed the indictment without the development of the record at the time of sealing. Therefore, the Court agrees that the basis for maintaining the indictment under seal must be justified by the Government only when challenged by the Defendant *after* the unsealing of the indictment. Accordingly, the Court focuses on the current record to determine whether maintaining the Indictment under seal served legitimate prosecutorial objectives.

### 2. Legitimate Prosecutorial Objectives

The Government has the burden of establishing the sealing of an indictment serves legitimate prosecutorial objectives. *See, e.g., Srulowitz*, 819 F.2d at 41 (explaining that "the government, if challenged, must demonstrate legitimate prosecutorial purposes for the secrecy of the indictment"). Here, the Government proffers two legitimate prosecutorial objectives that were served by the sealing of the Indictment.

First, the Government claims there was an ongoing criminal investigation, almost a "second phase" of the investigation, in which many unindicted co-conspirators may have been lulled into a false sense of security. The Government's Opposition at 14-19 and the FBI agent's declaration[2] describe the ongoing investigation, activities, and actual and anticipated results. (*See also* Doc. 54, Habben Decl. ¶¶ 6-9.) Second, the Government presents evidence that there was ongoing covert investigatory activity by cooperating witnesses. (*See* Opp. at 17-19; Habben Decl. ¶¶ 10-19 & Exhibits.)

In response, the defense points to a number of public statements made by the Government before and during the seal period in which the Government affirmatively represented that a criminal investigation was ongoing and that further indictments were expected. (*See* Reply at 7-10.) Nevertheless, the Government may be forced to make or can choose to make some general representations regarding an ongoing investigation, or even to release some specific details thereof, without incurring the duty to make all the details public. None of these disclosures specifically identified Defendant Gross. Had the Government made the fact of Defendant's Indictment public and then delayed seeking an order lifting the stay, the Court's conclusion would likely be different. As it is, notwithstanding the disclosures made by the Government, maintaining the Indictment under seal in light of the ongoing investigation still served legitimate prosecutorial objectives.

On the record before it, the Court finds that the Government has met its burden of establishing two legitimate prosecutorial objectives for maintaining the Indictment under seal. Therefore, the Court DENIES Defendant's Motion to Dismiss Certain Counts.

---

[2] Some details of the investigation were made available to the Court *in camera*. A redacted version of the *in camera* material was made available to defense counsel. The Court notes that the redacted material is narrowly tailored to protect "sources and methods" of an ongoing investigation, such as identities of persons cooperating with the Government and the manner in which they cooperated. The materials also identify targets of the investigation during the seal period.

### III. Motion to Dismiss All Counts

Defendant seeks to dismiss all counts based on the failure to allege certain elements of the charged offenses.

#### A. Legal Standard for Dismissal of Indictment

An indictment must set forth the elements of the charged offenses. The details of the charges must be sufficiently detailed

> (1) to enable the defendant to prepare his defense; (2) to ensure him that he is being prosecuted on the basis of the facts presented to the grand jury; (3) to enable him to plead double jeopardy; and (4) to inform the court of the alleged facts so that it can determine the sufficiency of the charge.

*United States v. Bernhardt*, 840 F.2d 1441, 1445 (9th Cir. 1988). The allegations of the indictment are presumed to be true. *Id.* at 1445-46. "An indictment that tracks the words of the statute violated is generally sufficient [if] implied, necessary elements, not present in the statutory language, [are] included in [the] indictment." *United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995) "[T]he issue . . . is whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge, not whether the Government can prove its case." *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982).

#### B. Honest Services Fraud

Honest services fraud is a variant of both mail fraud and wire fraud. Both are charged in the Indictment. At the outset, the Court observes that the scheme alleged in the Indictment falls squarely into the category of conduct prohibited by the offense charged. In examining whether the offense of honest services fraud is unconstitutionally vague,[3] the United States Supreme Court observed "[W]hatever the school of thought concerning the scope and meaning of § 1346, it has always been as

---

[3] The *Skilling* Court found § 1346 void for vagueness except for instances of bribes and kickback schemes. *Skilling*, 561 U.S. at 412 ("Interpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague.")

7

plain as a pikestaff that bribes and kickbacks constitute honest-services fraud . . . ." *Skilling v. United States*, 561 U.S. 358, 412 (2010) (internal citations omitted).

Here, Defendant challenges the sufficiency of the allegations regarding fiduciary duty, materiality, intent, and use of the mails.

### 1. Breach of Fiduciary Duty

"[A] breach of fiduciary duty is a requisite element of honest services fraud." *United States v. Milovanovic*, 678 F.3d 713, 722 (9th Cir. 2012), *as amended* (May 22, 2012). In this context, "fiduciary duty" is defined broadly to include not just formal fiduciary relationships but also "other similar relation[ships] of trust and confidence." *Id.* at 723 (citations omitted). Defendant argues at length that the Indictment does not allege a breach of fiduciary duty. (MTD All Counts at 5-10.) He does so by characterizing his failure to disclose the kickbacks-for-referrals arrangement as a failure "to disclose non-medical information to patients." (*Id.*)

The allegations in the Indictment support a finding that Defendant and his patients were in a fiduciary relationship such that his failure to disclose the alleged kickbacks would amount to a breach of that fiduciary relationship. A fiduciary duty in this context can arise from a formal fiduciary relationship or a "similar relation[ship] of trust and confidence." *Milovanovic*, 678 F.3d at 723. In *Milovanovic*, the Ninth Circuit approved of the Eleventh Circuit pattern jury instruction defining a "fiduciary obligation" within the context of honest services fraud:

> A "fiduciary" obligation exists whenever one person—the client—places special trust and confidence in another person—the fiduciary—in reliance that he will exercise his discretion and expertise with the utmost honesty and forthrightness in the interests of the client, such that the client relaxes the care and vigilance which he would ordinarily exercise, and the fiduciary knowingly accepts that

8

     special trust and confidence and thereafter undertakes to act
     on behalf of the client based on such reliance.

*Id.* at 723 n.9. A physician's duties toward his patients fall squarely within this definition. Patients seeking health care, and particularly, patients seeking life-altering spinal surgery, will necessarily place special trust and confidence in their physicians. No other person has the specialized knowledge, skill, and judgment to guide them regarding their treatment. In a typical physician-patient relationship, the physician is aware of the patient's trust and confidence, and acts on behalf of the patient based on that trust and confidence by, *inter alia*, identifying and recommending a particular treatment or surgery, obtaining informed consent, arranging for a patient's surgery, ordering pre-surgical tests, and selecting surgical hardware to be used.

  Therefore, the Indictment sufficiently alleges a fiduciary relationship, and the Court rejects Defendant's argument to the contrary.

    **2.**  **Materiality**

  Defendant argues that the alleged omissions were not material. (*See* MTD All Counts at 16-18.) "[T]he misrepresentation or omission at issue for an 'honest services' fraud conviction must be 'material,' such that the misinformation or omission . . . naturally tend[s] to" influence "or is capable of leading a reasonable [person] to change [his or her] conduct." *Milovanovic*, 678 F.3d at 727.

  Here, the Indictment alleges that Defendant failed to disclose to his patients that a substantial illegal economic benefit would be paid to him as a direct result of whether the patients accepted his recommendation regarding having the surgery at Pacific Hospital and/or having particular surgical hardware implanted. (¶ 24(a).) Without full disclosure, Defendant's patients were led to believe that they could rely on Defendant's unbiased recommendation for a particular treatment. The patients would have more of a tendency to accept the recommendation of their physician without skepticism. However, full disclosure of the kickback scheme would have alerted the patient of the possibility that Defendant was motivated by financial gain

1  rather than by the patient's best interest; in this manner, the omission is of the type
2  that naturally tends to influence or, at the very least, is capable of leading a reasonable
3  person to change his or her decision.  *See Milovanovic*, 678 F.3d at 727.
4      Thus, under the relevant definition, the omissions alleged in the Indictment are
5  material, and Defendant's argument to the contrary is rejected.

### 3. Intent

7      Next, the defense contends that Defendant must have acted with the specific
8  intent to harm his patients or must have actually harmed his patients.  (MTD All
9  Counts at 10-16.)  For this argument, Defendant relies heavily upon *United States v.*
10 *Jain*, 93 F.3d 436 (8th Cir. 1996).  This argument is based on a previously recognized
11 distinction between "honest services" fraud in the public sector and "honest services"
12 fraud in the private sector.  Honest services fraud in the public sector was viewed as
13 causing harm in the form of a a violation of the "political contract," the duty of public
14 officials to serve in an honest manner.  *Jain*, 93 F.3d at 442 ("When official action is
15 corrupted by secret bribes or kickbacks, the essence of the political contract is
16 violated.").  But in the private sector, intangible harm is more difficult to discern; thus,
17 in the Eighth Circuit's view, convictions for "honest services" fraud in the private
18 sector "almost invariably included proof of actual harm to the victims' tangible
19 interests."  *Id.*  The *Jain* court also recognized that in the absence of actual harm to the
20 victims, an intent to harm could support a conviction.  *Id.*
21     Defendant's argument is unpersuasive because the public-private distinction
22 relied upon by *Jain* been rejected by the Ninth Circuit.  In *United States v. Williams*,
23 441 F.3d 716 (9th Cir. 2006), the Ninth Circuit rejected the approach taken in *Jain* and
24 instead accepted the reasoning of the Second and Sixth Circuits that required only
25 intangible harm in private-sector honest services fraud.  *Id.* at 723 ("We follow our
26 sister circuits and hold that the 'intangible rights' theory of fraud, as codified by
27 § 1346, can apply to private individuals as well as to public figures.").  Where the
28 "intangible rights" theory of fraud applies, there is no need to establish actual harm or

an intent to cause tangible harm. *Id.* ("[W]e and other circuits have recognized the viability of the 'intangible rights' theory when the private defendant stands in a fiduciary or trust relationship with the victim of the fraud.").

Additionally, at least one circuit has expressly held that *Jain* is no longer good law. *See United States v. Nayak*, 769 F.3d 978, 982 (7th Cir. 2014) (noting that *Skilling* overturned *Jain* and citing *Skilling*, 561 U.S. at 413 n.45).

Therefore, the Court concludes that the Government need not allege (or prove) an intent to harm or actual, tangible harm to the victims of the referrals-for-kickbacks scheme.

### 4. Mailings in Furtherance of the Scheme to Defraud

Finally, Defendant argues that the alleged mailings are not actionable because they were not taken in furtherance of the scheme to defraud. (MTD All Counts at 18-21.) The Indictment alleges that as a result of the failure to disclose the kickbacks, the patients lost the opportunity to more closely scrutinize the recommendation to have surgery and the recommended hospital, seek a second opinion, insist upon a different hospital, or forego the recommended surgery altogether. (¶ 25.) Defendant reasons that in light of the nature of the alleged harm to patients, the fraud was complete once the surgery was complete. (MTD All Counts at 19-20.)

The statutory language requires that mails be used "for the purpose of executing" the fraudulent scheme or "attempting to do so." 18 U.S.C. § 1341. The nature of the scheme here is far broader than Defendant's role in it: Defendant referred patients to Pacific Hospital in exchange for kickbacks (¶ 24(a)), but the scheme also involved the billing by Pacific Hospital to insurers and attorneys to collect on claims for those patients' care and use of the mails and wires to do so. (¶ 24(c).) Moreover, the scheme involved the execution of bogus contracts to conceal the illicit transfers, including transfers to Defendant, and it involved communications among the conspirators to manage the operations of and payment for participants'

agreed-upon actions in furtherance of the scheme. (*See* ¶ 24(h)-(j).)  Mailings made to further any of these activities would satisfy the "use of the mails" element.

The allegations regarding the mailings at issue here all involve claims for reimbursement sent to personal injury attorneys by Pacific Hospital for the hospital-billing component of surgeries performed by Defendant.  (Indictment at 30-32.)  As such, the mailings were in furtherance of the attempt to collect on claims for the patients who had kickback-tainted surgeries performed by Defendant.  Therefore, the Indictment alleges that these mailings were made "for the purpose of executing [the] scheme . . . or attempting to do so."  18 U.S.C. § 1341.

The Indictment sufficiently alleges the elements of honest services fraud.

### C. Use of Interstate Facility in Aid of Unlawful Activity ("Travel Act Violation")

Defendant also challenges the sufficiency of the Travel Act count.  The Travel Act provides that "[w]hoever . . . uses the mail or any facility in interstate or foreign commerce with [the] intent to . . . carry on . . . an[] unlawful activity, and thereafter performs or attempts to perform" an "unlawful activity," is guilty of a crime.  18 U.S.C. § 1952(a).  In this context, those "unlawful activit[ies]" include "distribut[ing] the proceeds of any unlawful activity; or . . . promot[ing], manag[ing], establish[ing], carry[ing] on, or facilitat[ing] the promotion, management, establishment or carrying on of any unlawful activity."  18 U.S.C. § 1952(a)-(b).  Relevant to this case, the statutory definition of "unlawful activity" includes "bribery . . . in violation of the laws of the State in which committed or of the United States."  18 U.S.C. § 1952(b).

#### 1. Bribery

Defendant argues that the state laws identified in the Indictment do not prohibit "bribery" and therefore may not serve as a basis for the "unlawful activity" referred to in the Travel Act.  (MTD All Counts at 21-24.)  The Indictment identifies California Business and Professions Code § 650 ("§ 650") and California Insurance Code § 750 ("§ 750") as the bases for the Travel Act element of "unlawful activity."  (¶¶ 18-20.)

California Business & Professions Code § 650 bars medical professionals from receiving compensation in exchange for patient referrals. California Insurance Code § 750(a) has a similar prohibition that applies to those involved in medical or insurance claims processing. These statutes criminalize the payment of referral fees or, more colloquially, they prohibit "kickbacks." In essence, Defendant argues that "kickbacks" are not "bribes."

However, the definition of "bribery" in this context is broad enough to encompass the kickback arrangement involved in the scheme alleged in the Indictment. In *Perrin v. United States*, 444 U.S. 37, 49 (1979), the Supreme Court held that the term "bribery" as used in the Travel Act means "the generic definition of bribery," described as "includ[ing] payments to private individuals to influence their actions." *Id.* at 45-46, 49. Thus, the Travel Act's prohibition against bribery reaches "all relations which are recognized in a society as involving special trust [that] should be kept secure from the corrupting influence of bribery." *See United States v. Ferriero*, 866 F.3d 107, 123-24 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 1031 (2018) (citing *Perrin*, 444 U.S. at 45 n.11).

The kickbacks at issue here fit within these descriptions. A "kickback," at least in the context of this case, is a particular type of bribe. In fraud cases involving medical billing, these bribes are often characterized as "rebates" or "referral fees," but in substance, the payments are illegal monetary incentives meant to induce a person, often a doctor, to use his or her position of trust to influence another, often the patient, for the purpose of financially benefitting a third party because that third party has agreed to pay the influencer a portion of revenue generated by the referral. This type of monetary incentive easily falls into the generic definition of bribery of "payments to private individuals to influence their actions." *Perrin*, 444 U.S. at 45.

After *Perrin*, other courts have concluded that arrangements involving compensation referred to as "kickbacks" constitute "bribery" within the meaning of the Travel Act. *United States v. Piccolo*, 835 F.2d 517, 518, 520-21 (3d Cir. 1987)

(affirming Travel Act conviction as applied to a "kickback scheme" that violated state law); *United States v. Seregos*, 655 F.2d 33, 37 (2d Cir. 1981) (same).

### 2. Section 750's Applicability to Defendant

Defendant contends he was not involved in processing insurance claims. (MTD All Counts at 24.) However, the Indictment alleges he was. (*See* ¶¶ 24 & 36.) At this stage of the proceedings, the truth of the allegations is assumed, and evidence is not considered.

### 3. Specific Intent

Defendant argues that a specific intent to promote, establish, or facilitate one of the prohibited activities is required, and § 650 is a general intent crime.

In *People v. Hering*, 20 Cal. 4th 440, 445 (1999), the California Supreme Court noted the defining characteristics of a specific intent crime under California law: "When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." *Id.* The Supreme Court went on to conclude that both § 650 and § 750 are specific intent crimes:

> As relevant here, Business and Professions Code section 650 and Insurance Code section 750 in essence prohibit the offering of "any rebate . . . or other consideration . . . as . . . inducement" for referring patients. With respect to the offender's state of mind, the gravamen of each crime is the motivation for the rebate: to induce referrals. . . . Whether these offenses require some other specific intent is a closer question. . . . Business and Professions Code section 650 and Insurance Code section 750 can be read to require a finding that the defendant made the offer of a rebate for the purpose of inducing the referral of patients. Thus, if constrained to do so, we would denominate them specific intent crimes.

*Hering*, 20 Cal. 4th at 445-46 (paragraph structure altered).

Therefore, Defendant's argument is unpersuasive, and the Court DENIES Defendant's Motion to Dismiss All Counts.

## IV. Conclusion

As set forth herein, the Court DENIES Defendant's Motion to Dismiss Counts 2-8 And 10-14 of the Indictment (Doc. 31). The Court denies the request to cross-examine Agent Habben. (*See* Reply at 10.)

The Court also DENIES Defendant's Motion to Dismiss Indictment (Doc. 61).

**IT IS SO ORDERED.**

**DATED:** March 27, 2019

_____
The Hon. Josephine L. Staton
United States District Judge